No. 31,431

The State of Kansas, *Appellee*, v. Fred E. Fisher, *Appellant*.

(38 P. 2d 115)

Opinion filed December 8, 1934.

*J. N. Tincher, Charles Hall, H. E. Ramsey* and *Clyde Raleigh*, all of Hutchinson, for the appellant.

*Roland Boynton*, attorney-general, *Max Wyman*, county attorney, *John Fontron*, assistant county attorney, *Robert Mason*, of McPherson, and *Eustace Smith*, of Hutchinson, for the appellee.

The opinion of the court was delivered by

Burch, J.: Fred E. Fisher was convicted of violating the speculative securities act, and appeals.

The information contained seven counts charging unlawful sales of securities on dates between November 26, 1930, and May 12, 1931. Defendant was convicted on four counts, and was sentenced to confinement in the penitentiary for a term of from one year to seven years on each count, the terms to run consecutively.

The gravamen of the charge in each count was that the Fisher Plan Loan Corporation, a Kansas corporation, was granted a permit to sell its preferred stock on a statement of the plan on which its business would be conducted; that on September 8, 1930, the plan was changed by the board of directors; that no statement of the proposed new plan of transacting business was filed with the bank commissioner; and that after the change of plan defendant sold preferred stock of the loan corporation. The change of plan was from specializing in loans to salaried people to making loans to the Fisher Ranch Corporation.

There were several Fisher corporations, the organization of which need not be detailed. The special assistant bank commissioner in charge of administration of the speculative securities act testified the banking department made examinations of these corporations at frequent intervals; they made quarterly reports; he supervised their activities, and there were no discrepancies between the reports and the records of the companies.

In March, 1931, more than six months after the change of plan occurred, Harry Warren, an examiner, and H. M. Barnes, an investigator, employees of the banking department, completed an examination and audit of the Fisher Corporations, and on March 21, 1931, they made their report. The letter of transmittal follows:

"WICHITA, KAN., March 21, 1931.
"Mr. Carl Newcomer, Blue Sky Commissioner, Topeka, Kan.:
"DEAR MR. NEWCOMER—We have made an examination and audit of all the Fisher Companies of Wichita, and are herewith submitting our report:

"EXHIBIT A
"Consolidated statement of all Fisher companies

"The Industrial Securities Corporation.
The Provident Savings & Finance Corporation.
The Kansas City Fisher Plan Loan Corporation.
Wichita Fisher Plan Loan Corporation.
Hutchinson Fisher Plan Loan Corporation.
Oklahoma City Fisher Plan Loan Corporation.
Fisher Ranch Corporation.

"EXHIBIT B
"Consolidated profit and loss account for year 1930

"The Fishers also own The Safety Savings Building and Loan Association, which we did not examine, but are showing statement of same at close of business March 17, 1931, making total assets of $1,597,547.50. On the following pages we have shown statements, profit and loss accounts of each company.

"Their current assets are $513,385.07 and current liabilities $161,676.30, which

shows a healthy condition, and nearly all of their current liabilities are payable to themselves, with the exception of a cattle note of $57,758.33 and $1,100 to a bank. All the balance is due the Fishers and the inter companies.

"They have fixed assets consisting of land, machinery and furniture and fixtures of $446,183.42, and mortgages of $94,188.40, long maturities.

"Have bonded indebtedness of $177,000, of which $142,500 is twenty years, balance five years.

"The bonds being sold now are 7 per cent for five-year maturity, and they assign salary loans amounting to 125 per cent of bonds issued. At the present time the total 7 per cent collateral trust bonds issued and outstanding by the Fisher Plan Loan Corporation of Wichita is $30,500, and we checked and found they had assigned $56,714.92 of salary notes as collateral security on said bonds, which is almost twice as much notes assigned as there are bonds issued. Their assistant secretary of the Building and Loan Company is trustee. We made a check of all canceled bonds, listed the collateral, and found them to be in balance. It is somewhat unusual to have one of their employees act as trustee, but it would be nearly impossible to have it otherwise, as the collateral is small salary loans, payment being made weekly, semimonthly and monthly. Complete records are kept.

"EARNINGS AND OPERATIONS

"Have been ample to pay dividends. The Fisher Plan banks show a reasonable profit each year.

"The Fisher Ranch Corporation is the largest company and engages in the general farming and cattle business, having 10,240 acres under cultivation on Kansas property. They have 5,200 acres of grass land in Lincoln county, Colorado. They have 1,600 high-grade Hereford cattle now. The ranch made money for the year 1930. They sold $33,000 worth of wheat, $4,320 worth of barley, and have on hand $28,000 worth of grain and feed.

"They are equipped with the most modern machinery, farming their large acreage with scientific methods. Salaries have been reduced considerably for the year 1931.

"MANAGEMENT

"Mr. Fred E. Fisher, president and general manager of all the Fisher interests, is forty years old, and divides his time between the ranch at Tribune, Kan., and the various Fisher Plan industrial banks.

"His father, E. E. Fisher, is seventy years old, and has active charge of the ranch. He has been actively engaged in accounting and real-estate-loan business all his life.

"Mr. Dean L. Fisher, a brother, was in active charge of the banks, but has moved to Oklahoma City, where he will be in full charge of the Oklahoma City bank.

"In conclusion, we think the company is well and capably managed.

"We wish to acknowledge with appreciation the courtesy shown us by the management and office force in the making of this examination and the preparation of the report.     Respectfully yours,

"HARRY WARREN, Examiner,
"M. H. BARNES, Examiner."

On December 5, 1931, receivers were appointed for the Fisher Plan Loan Corporation and the Fisher Ranch Corporation.

It will be noted the letter transmitting the Warren-Barnes report stated the Fisher Corporations kept complete records. A witness for the state, an auditor who audited the books and records of the loan corporation, testified the condition of the books and records was very good, they were kept very good, nothing was covered up, and there was no juggling of records.

On October 3, 1932, ten months after the receiver was appointed, more than eighteen months after the Warren-Barnes report was made, and more than two years after the board of directors adopted a new plan of doing business, the complaint which initiated the criminal proceeding under review was filed. The information was filed approximately six months later, and the trial commenced on April 18, 1933. At the conclusion of the state's evidence a motion was made for a directed verdict in favor of defendant on the ground no public offense had been proved. The motion was denied. After verdict a motion for new trial was filed, which was denied.

As indicated, the information charged change of plan by the board of directors on September 8, 1930. In stating specifically what the jury was obliged to find before it could convict, the court charged the jury respecting change of plan as follows:

"4. That the plan of operation of the Fisher Plan Loan Corporation had been materially changed between the time of the registration of such stock and the issuance of a permit therefor by the state charter board and the sale or sales of such preferred stock."

So, action by the board of directors in changing plan of transacting the corporate business, and pleaded time of changing plan, were taken out of the case by the court. No instruction was given the jury with respect to what would constitute a change of plan, or how a change of plan might be effected, and the jury was permitted to find whatever it might think was a change of plan, effected in any manner it might deem sufficient, any time after registration and before sale. The latest sale charged was made May 12, 1931.

What happened on September 8, 1930, was, the Fisher Plan Loan Corporation gave the Fisher Ranch Corporation two checks, one for $299 and one for $2,001, for which the ranch corporation gave its notes. When the notes were to mature was not proved. So far as the evidence disclosed, they may have been short-term notes which were paid at maturity. In view of the Warren-Barnes re-

port in March, 1931, it may not be inferred the ranch corporation was in deep financial distress on September 8, 1930. Because the loan of September 8, 1930, was the first of a series extending to March, 1931, and afterwards, it may be inferred the ranch corporation expected to need temporary accommodation; but there was no evidence that on or about September 8, 1930, a plan was adopted by the board of directors of the loan corporation of employing its capital in financing the ranch corporation generally, or for any definite period, or to any definite extent.

The state's evidence was, the loan corporation had a board of directors consisting of seven members. Defendant was a member of the board, and he was chairman of the ranch corporation board. The loan corporation had a loan department. When the ranch corporation needed money defendant would make a proposition to the loan department of the loan corporation, and the department would make loans. Three directors of the loan corporation were in charge of the loan department, and one of them, a witness for the state, said they made the loans at the direction of the board of directors.

Following September 8, 1930, the loan corporation continued to make advancements to the ranch corporation. On March 17, 1931, the loan corporation purchased 1,232 shares of class A stock of the ranch corporation, for which the loan corporation gave its check to the ranch corporation for $98,560. At the same time, the ranch corporation gave its check to the loan corporation for a balance of unpaid indebtedness to the loan corporation of $98,200. The notes of the ranch corporation were returned to it, and it is a fair inference the ranch corporation paid its indebtedness to the loan corporation with the money derived from sale of the stock. This indebtedness was all shown by the books and records of the two corporations when the Warren-Barnes examination and audit were made in March, 1931, and no recommendation was made concerning it. The report shows the financial condition of both corporations was still good; earnings had been ample to pay dividends; the ranch had made money in 1930; and the loan corporation had made a reasonable profit each year.

The Fisher Loan Corporation was organized for profit, and the purpose for which it was formed, as stated in its charter, was to engage in a general loan and investment business and to transact all business necessary or incidental to such general loan and investment business. While the stifling consequences of the world-wide in-

dustrial and financial depression were becoming manifest, its length, breadth and depth were not perceived. It was not known the farming and cattle industries of this state were on the brink of ruin; and under the circumstances which have been stated, with prosperity still just around the well-known corner, it is impossible to conclude that in September, 1930, or in the year 1930, or before March, 1931, the loan corporation foresaw what was in the veiled future, discarded an existing plan of doing business, and adopted a new plan.

Between March, 1931, and September, 1931, the loan corporation made six additional purchases of shares of the ranch corporation stock, so that when the receiver was appointed on December 5, 1931, the aggregate amount of ranch stock owned by the loan corporation was $113,370. The ranch corporation also owed the loan corporation eight or nine notes, aggregating $21,120, so that the loan corporation's total investment in the ranch corporation was $134,490. Assuming this investment was made pursuant to a new plan of doing business adopted by the loan corporation on March 17, 1931, when shares of ranch stock were virtually taken in payment of debt, the state's brief, citing the abstract, shows the last sale of securities for which defendant was convicted was made March 10, 1931.

The subject just discussed may be left at one side.

The charter of the loan corporation was granted on February 20, 1929, and, as indicated, the corporate purpose was to conduct a general loan and investment business for profit. On July 15, 1929, the corporation made application for a permit to sell preferred stock. On July 25, 1929, a permit was duly granted by the charter board. On subsequent application a permit was granted the loan corporation to sell bonds, on a statement of plan identical, as far as material here, with the previous statement. Defendant was not convicted of selling bonds.

The corporation had been doing business before it made application for permit to sell preferred stock. In order to secure a permit the corporation was required to make a statement of its assets and liabilities, and did so.

To obtain a permit, the statute required that the application should contain a statement showing in detail the plan on which the business was to be conducted. The statute also provided it should be unlawful to sell securities when the business was conducted on any other plan, unless a statement had been filed with the bank

commissioner showing in full detail the proposed new plan. The loan company's statement of plan reads:

"That the following is the general plan upon which the company is doing and intends to do business and the purposes for which said securities are to be sold:

"The Fisher Plan Loan Corporation specializes in loans to salaried people, requiring on its notes the signature of the borrower and his wife, and three indorsers. During its existence it has shown substantial profits after all interest and dividend charges have been paid. It proposes to continue to do business in the future in the same manner in which it has done business in the past. With reference to the purposes for which the securities are to be sold, we refer you to paragraph 12 above."

Whether the statement of proposed plan of doing business was sufficient in form or content to satisfy the statute is not material. A permit was issued by the charter board on the statement, such as it was, and the prosecution was predicated on sale of stock after an undisclosed change of plan from that stated to a new plan.

The statement to procure a permit showed salary loans in July, 1929, amounting to $96,788.50. An auditor, who was a witness for the state, testified he audited the salary loans, but he did not trace decline in amount of salary loans through the year 1930. He began with January 31, 1931, and the amount on September 8, 1930, was not disclosed. On January 31, 1931, the unpaid balance of salary loans was only $42,303. There was an increase to $49,554 on March 31, 1931. After that, salary loans steadily declined, and on December 5 the amount was only $24,365.

Whatever the amount of decline in salary loans beginning September 8, 1930, there was a reason for it, but the state made no effort to prove what caused it. All the state's brief has to say about it is that the loan corporation, instead of specializing in salary loans, was specializing in the ranching business; that the corporation ceased to specialize in salary loans, and either became a specialist in the ranch business, or in investments in the ranch business.

That the business of making salary loans was not discontinued is proved by the increase in such loans between January 31 and March 31, 1931. There was no proof that salary loans were available as they had been, or that any grantable application for a salary loan was rejected because funds were diverted to other uses, or for any other reason. There was no proof that usual methods of securing salary loans, by solicitation, advertisement, or otherwise, were relaxed; and the statements in the state's brief

are pure metaphors. They are not legitimate inferences of fact from proved facts, and there was no evidence that advancements to the ranch corporation had anything to do with dearth of salary loans.

Defendant suggests it is a matter of common knowledge that the period during which the loan corporation was lending money to the ranch corporation and was investing in ranch stock, was one of vanishing salaries, and the volume of salary loan business declined, just as the volume of all other kinds of business declined. The state retorts, defendant did not prove it.

Defendant was not required to prove there was no relation between decrease in salary loans and increase in ranch loans. The state was required to prove not only that there was such a relation, but that the relation was such as to establish a change in plan of doing business. Whether defendant's suggestion be sound or not his argument may be contrasted with that of the state.

The record shows "salary" loans were loans to persons who made weekly, semimonthly and monthly payments. Defendant's contention comes to this: It is a matter of common knowledge pay rolls were being cut to a meager minimum. The number of responsible indorsers whom working people could procure was diminishing. The volume of all other kinds of business was shrinking, and there is fair ground for inference the volume of salary loans would decrease and would thus release capital normally employed in making salary loans. The state's contention comes to this: The loan corporation commenced to make loans to the ranch corporation. As loans to the ranch corporation increased salary loans decreased. Therefore, decrease in salary loan was a consequence of increase of ranch loans. The conclusion is a *non sequitur*, and presents an example of the ancient fallacy, *post hoc, ergo, propter hoc.*

The state was obliged to prove change of plan of employment of the capital of the loan corporation, as given in the application for permit to sell preferred stock, to a new plan.

The application for permit to sell securities stated the general plan on which the corporation was doing and intended to do business was, that the corporation specialized in loans to salaried people, on notes signed by the borrower and his wife and three indorsers; and stated the corporation proposed to continue to do business in the future as in the past. The state focuses attention on the single word "specializes" and assigns to it a meaning which forbade doing

any loan or investment business except making salary loans. The state's brief contains the following:

"To 'specialize' means to concentrate on one particular thing or subject. Webster's Twentieth Century Dictionary defines 'specialize' as 'to follow a special profession, study or subject; to do a distinctive work; to take a specific turn.'"

The quoted definition is not contained in the New Merriam-Webster dictionary, just published as of the year 1935. Accepting the definition, it does not say, "to follow a special subject exclusively," or "to do a distinctive work and no other."

The pertinent definition in the 1935 edition of the dictionary is "To pursue a special mode of action or development; as: a. To concentrate one's efforts on a special subject, business, line of investigation, etc." The definition does not say "To pursue a special mode of action exclusively." The illustration is very restrictive, since to concentrate is defined "To bring all one's powers, faculties or activities to bear upon one course of action."

The Oxford English dictionary gives the following definition of specialize: "4. Intr. a. To engage in special study or some special line of business, etc." The same book defines "specialist" as follows: "2. In general use, one who specially or exclusively studies one subject or one particular branch of a subject."

The Oxford English definition does not say "To engage in some special line of business and no other," and the definition of "specialist" recognizes what is true, namely: That in general use the term "specialize" is a relative term, a term of degree, and that it may range in application from more than ordinary to exclusive. A student in college may specialize in science, but he studies English and a number of other subjects required for a degree. A lawyer may specialize in commercial or probate or criminal law, without losing his character as a general practitioner. A restaurant may specialize in coffee like mother used to make, but the coffee is served with a full meal.

All this is academic. No matter what the specialists in English may decide, the question here is: What did the statement made by the loan corporation mean? In connection with the statement that the corporation specialized in salary loans, the statement said the corporation proposed to do business in the future as in the past. The statement showed on its face, in the exhibition of assets and liabilities, that while in the past the corporation had made salary

loans in the sum of $96,000, it had invested in stocks and bonds in the sum of $45,000. There was no intention to abandon all charter powers except the making of salary loans, and what the statement meant was that the loan corporation placed emphasis on making salary loans.

Without pursuing the subject further, the court holds the loan corporation was not limited by its statement to making salary loans and no others, and there was no evidence the corporation changed its plan of doing business.

The motion for new trial alleged the verdict was not sustained by the law or the evidence, which is true, and the judgment must be reversed.

The information charged a specific kind of offense. The information charged no other offense, defectively, inferentially, or otherwise, for which defendant may be held and tried. Defendant was guilty of no offense, and it becomes the duty of this court to direct that he be discharged. (R. S. 62-1717.)

The judgment of the district court is reversed, and the cause is remanded with direction to discharge the defendant.