No. 35,748

THE STATE OF KANSAS, *Appellee*, v. NORMAN M. REHG, *Appellant*.

(139 P. 2d 838)

Opinion filed July 10, 1943.

*Austin M. Cowan,* of Wichita, argued the cause, and *Robert H. Nelson, Grey Dresie,* both of Wichita, and *E. W. Grant,* of El Dorado, were on the briefs for the appellant; *C. A. McCorkle, W. A. Kahrs* and *Henry L. Butler,* all of Wichita, of counsel.

*R. C. Woodward,* of El Dorado, argued the cause, and *A. B. Mitchell,* attorney general, *Braden C. Johnston,* assistant attorney general, and *O. J. Connell, Jr.,* county attorney, were on the briefs for the appellee; *Gale Moss,* of El Dorado, of counsel.

The opinion of the court was delivered by

HARVEY, J.: Norman M. Rehg was charged under the latter part of G. S. 1935, 21-545, with the embezzlement of $1,170 which came into his hands as financial secretary of the Keystone Copper Mining Company of Arizona. A trial resulted in his conviction and sentence. He has appealed and presents many assignments of error.

The pertinent facts shown by the evidence may be summarized briefly as follows: The Keystone Copper Mining Company of Arizona, a corporation, hereinafter called the Company, had mining properties near Dragoon, in Cochise county, Arizona. Its principal active officers were U. R. (Bert) Miller, president; T. C. (Clyde) Miller, secretary, and C. W. (Chuck) Miller, son of U. R. Miller, who appears to have held various positions in the organization. The mines had been operated for several years. By 1935 the Company had an estimated thirty-thousand-plus tons of ore, most of which was at the top of the mine, ready for milling, but needed money to mill the ore and place the products on the market. Their attorney, so far as these operations were concerned at least, was John W. Blood, of Wichita, a capable lawyer of good standing. Mr. Rehg lived at El Dorado, Kan., and for perhaps ten years had been engaged in the business of selling corporate bonds and securities and had built up an extensive clientele, many of whom entrusted him with funds to invest in such properties and had given him powers of attorney for that purpose. In 1935 he was contacted by the officers of the Company to sell securities or notes to raise $25,000 needed for the Company's business. In preparation for this work Rehg went to the mines in Arizona and took with him several persons of high standing, well experienced in business affairs and corporate investments, who resided in or near El Dorado, and together they investigated the property and talked with the various officers of the Company with the view of determining whether investments made to raise the $25,000 would be sound and well secured. The testimony disclosed these men were informed by Bert Miller and other officers of the Company that the Company owned the approximately 355 acres of land upon which there were eighteen mining claims, also owned all the buildings, which were quite extensive, and mining equipment; that the same was unencumbered by mortgages, taxes, judgments or other liens. Upon these representations, which Rehg testified were made not only to himself and others at

the mine but to him repeatedly through the years 1935 and 1936, and upon which he relied, he undertook the task of trying to raise the $25,000 needed. The Company at the time had not secured a permit from the state corporation commission to sell its·stock or securities in Kansas. The officers of the Company and their attorney and Rehg thought the matter could be handled by Rehg making loans for his clients under powers of attorney which he had from them. A form of "note contract" was prepared which by way of preamble recited that the Company was the owner and operator of certain mining claims and had about thirty-thousand-plus tons of copper-bearing ores, and after certain minor repairs and additions were made the company had facilities for concentrating the ore through its mill at the mine, and ————— (the name of the person advancing money) had loaned to the Company certain sums for the purpose of milling the ore and preparing the same for smelting and putting the mill and mine in operating condition. *It was agreed by the Company* that in consideration of the sum of ——— (to be inserted) loaned it by ————— (name of person advancing money) the Company agreed to repay said ————— (lender) within twelve months according to the terms of this contract, the Company to have the right to extend payment not to exceed an additional twelve months. By its terms the Company agreed to set aside the thirty-thousand-plus tons of ore as security for the payment of the sum of $25,000, of which the contract was a part; that out of the gross receipts from the ore milled to set aside at least 7½ percent in a separate fund to be placed in the Walnut Valley State Bank at El Dorado, to be paid monthly to the payee of the note, and others having similar note contracts, and that the 7½ percent should be a first and prior charge upon the smelter returns, and the Company agreed to pay semiannually 4 percent interest from the date on all balances due on the money loaned, and further that the payee of the note contract and others loaning a part of the $25,000 should have the right to inspect the mine, returns from smelters and the books of the Company until the money advanced with interest was fully paid; "and the Company further agrees that there are no outstanding liens or mortgage on the real property of the Company except $1,500 and that same will be paid, and that the Company will not place any liens, mortgage or encumber said property until the $25,000 loan herein is fully paid." The note contract further provided that in case the Company failed to carry

out the terms of this agreement the payees of the note contracts should have the right to operate the mines, to mill the ore, and from the receipts thereof pay the actual expenses, including a representative of the creditors, and apply the balance toward the payment of the $25,000 borrowed. Rehg was given a number of these note contracts, blank as to date, amount and name of lender, and was authorized to fill those blanks and deliver the note contracts as they were sold.

Rehg sold $3,200 worth of these contracts in 1935 and 1936 and furnished the Company's attorney with copies of the powers of attorney under which he acted. It was concluded best, however, to procure authority from the state corporation commission to raise the money on these note contracts. Whereupon application was made to the state corporation commission, and after a hearing in November, 1936, the permit was granted. It was the plan of the Company under which Rehg operated that in borrowing the money on these note contracts the Company would deliver to the payee of the note contracts stock of the corporation in proportion to the amount of money loaned. For example, if $1,500 was loaned, 1,000 shares of no-par-value stock were given to the payee of the note contract as a bonus. In granting the permit to raise the money in this manner the corporation commission declined to permit the Company to issue additional stock, but required such stock as was given as a bonus should be given by the principal stockholders of the Company, and that plan was carried out.

On December 7, 1936, a written memorandum was entered into between the Company and Rehg pertaining to the raising of this money. In it the Company first admitted there was then due Rehg $480 for services under previous contracts, and for Rehg's assistance in procuring the permit from the state corporation commission and for services to be rendered, the Company employed Rehg and agreed to pay him five percent on such subscription payments in cash as commission and five percent in cash to be known as expenses, and twenty percent of the total amount, payable in twenty-four monthly installments to begin sixty days after the shipments of the ore to the smelters was commenced, and conditioned upon such shipments continuing and upon amounts reinvested by lenders in the purchase of the stock of the company under an "option to purchase contract," a ten percent commission should be paid to Rehg in cash. Under this contract of employment and the permit from the Kansas Corpo-

ration Commission Rehg borrowed for the Company upon these note contracts approximately $17,000 in 1937 from his clients, many of whom had executed to him a power of attorney authorizing him to act for them in the matter of investments. Perhaps a few sales were made early in 1938 which are not specifically detailed here. Rehg himself had loaned $1,500 to the Company under one of the note contracts. Some of the note contracts were coming due under their primary terms and no interest had been paid semiannually or otherwise upon them.

In February, 1938, Rehg made a trip to the mines to see how the business was progressing, found that no ore had been milled, and the Company apparently in no better position to go forward with that work than it was in 1936. Rehg made inquiries about that and was told by Bert Miller that they had had to do more work in the mines in getting ready than they had anticipated. Rehg asked Miller how much of the money he had sent in was still on hand. Miller told him they had about $2,700 in the two banks in which they kept accounts, one of them the Valley National Bank of Wilcox, Arizona, and the other the Walnut Valley State Bank of El Dorado. Rehg inquired of the Arizona bank and found there was nothing to the credit of the Company in that bank. Returning to El Dorado, he inquired of the Walnut Valley State Bank and was advised there was not enough money there to take up the $500 overdraft. Rehg then insisted that before any other money should be turned over to the Company he should be satisfied that it was being used for the purpose for which it was raised. As a result of his insistence on that point, and after a conference, the board of directors of the Company, at a meeting at which Rehg was present, held March 5, 1938, at El Dorado and recessed to March 12 at Wichita, adopted a resolution embodying an agreement reached, as follows:

". . . it was ordered by the Board that the balance of the funds obtainable from the *twenty-five thousand dollar* ($25,000.00) loan shall be used for placing the mill and concentrating plant in operation to the immediate end that regular smelters returns checks in payment for the Company's products may be received by the Company at the earliest possible date, and that the balance of the fund shall be held under control by the Company's financial secretary, Norman Rehg, and shall be advanced in denomination of *five hundred dollars* ($500.00) as needed, to the Company's general checking account in the Walnut Valley State Bank of El Dorado, Kansas, same to be subject to reports showing satisfactory performance of work at the Company's mines; the president of the Company, Bert Miller, to give to the Walnut Valley State Bank a daily report of work done and the money expended and

a public accountant to be sent to the mine who shall make a daily report to the Walnut Valley State Bank independent of the management of the *Keystone Copper Mining Company,* said report to cover work done daily and money expended daily; . . ."

On March 19, 1938, U. R. Miller, president of the Company, at Dragoon, Ariz., acknowledged in writing receipt of the resolution and agreed to comply with the same. Thereafter such daily reports were made to the Walnut Valley State Bank as provided in the resolution, and a Wichita auditing firm was employed and E. W. Morrison of that firm was sent to Arizona and began to do the auditing provided for in the resolution. These reports did not show very satisfactory progress. On April 9 Rehg sold one of the note contracts to J. W. Starkey of Augusta in the amount of $800, and on April 8, 1938, he sold one of the note contracts to Metta Robb of El Dorado in the amount of $500, but for some reason, not definitely stated, this contract was dated January 15, 1938. He had a power of attorney from each of those parties. The money received by Rehg from these sales forms the basis of the charge in this action. Rehg appears to have sold other note contracts in 1938, the proceeds of which were paid to the Company by deposits in the Walnut Valley State Bank, but the facts relating thereto appear to have been regarded as immaterial.

The reports provided by the resolution of March 12, 1938, which reached the Walnut Valley State Bank continued to show unsatisfactory progress and apparent use of the funds obtained from the note contracts for purposes other than provided therein. Rehg became distrustful of the accuracy of the representations previously made to him by the officers of the Company and which he had repeated to persons who had loaned money on the note contracts and began making independent inquiries relating thereto. He wrote the county treasurer of Cochise county, Arizona, inquiring with respect to taxes upon the property of the company, and on April 26, 1938, received a letter stating personal taxes of the Company were unpaid for the years 1932 to 1937, inclusive. He also learned facts tending to show the title to the about 355 acres of land was not in the Company and that the Millers were claiming to own much of the property previously represented to Rehg as belonging to the Company. On May 15, 1938, he conferred at Wichita with Mr. Morrison of the auditing firm and learned the firm's data showed judgments against the Company in favor of the Millers. He wired the clerk of the superior court of Cochise county, Arizona, asking for the record

of judgments against the Company, and on the next day received a telegram from the clerk listing judgments in favor of U. R. Miller, T. C. Miller and Mrs. W. W. Miller, their mother, aggregating $19,-772.90 against the Company. Thereupon Rehg called a meeting of the persons to whom he had sold the note contracts, which meeting was held in El Dorado in the evening of May 17, 1938. At this meeting he learned from others present that the Millers and other officers of the Company had individual claims against the Company aggregating $39,445.90, as being prior to or on a par with the holders of the note contracts. At this meeting a written demand was made upon the officers and directors of the Company purporting to be by a majority of the holders of the note contracts, spoken of throughout the demand as bonds, which stated that N. M. Rehg and S. H. Barnhill, both of El Dorado, were selected to represent the note holders as trustees, and it contained eleven specific stipulations or demands, including the demand that the then officers and directors of the Company be removed; that the judgments above mentioned be released of record; that the officers of the Company having claims against it promptly waive such claims as against the note holders; that the books of the Company be turned over to the note holders until the Company could be liquidated and their claims paid; that they be permitted to elect a majority of the directors and the principal officers of the Company; that there should be no transfer of the stock of the Company pending its liquidation; that the title to the 355 acres of land, together with all buildings and improvements thereon, be clarified in the Company, and some other specific demands respecting stock. This resolution and demand was duly signed by various note holders and promptly delivered. U. R. Miller testified that he received it within a day or two after its date.

On May 19, 1938, there was prepared in the office of the Company's attorney at Wichita a demand upon Norman M. Rehg to turn over to the Walnut Valley State Bank, of El Dorado, Kan., to be deposited in the name of the Company, "the money now held by you belonging to said Company, to wit, thirteen hundred dollars ($1,300.00)." He was further notified to return all blank bonds in his possession. There is a lack of clearness in the evidence as to whether that was delivered to Rehg, but a few days later, upon an inquiry of the president of the Walnut Valley State Bank, Rehg stated that he was not going to turn it over, and in a letter (exhibit G, not fully abstracted) written by Rehg under date of June 18,

1938, language is used indicating that he was holding "the last $1,170 of the proceeds of the bond issue" for the reason that he feared the officers of the Company would use it for the type of expenditures for which they had used previous proceeds of note contracts.

Thereafter things connected with the Company appear to have moved rather rapidly. Its officers declined to comply with the demands of May 17 of the holders of the note contracts. Rehg went to Arizona and procured an order from the federal court to examine the records of the Company and testified to having discovered irregularities and fraud in the issuance and transfer of shares of stock given to the purchasers of the note contracts as a bonus and which indicated that such shares were fraudulently issued, and to have discovered other facts tending to show fraud and misrepresentation of the officers of the Company. He also brought, or caused to be brought, an action in the federal court of Arizona in behalf of himself and other note contract holders to oust the old officers of the Company and put in a new management. At the time of the trial of this case he was president of the Company. On February 15, 1941, the Company filed a voluntary petition in bankruptcy in which it scheduled among its liabilities an indebtedness to Rehg of $4,238 as of the date of May 1, 1938, and showing taxes due the federal government, the state of Arizona and Cochise county, and showing liabilities to many other creditors. It is conceded in the state's brief that the Company was insolvent. Rehg also took up with various departments of the federal government what he regarded as wrongs of the Company and its officers, with at least two results. The Bureau of Internal Revenue, after investigating the affairs of the Company, determined there was due and owing the federal government from the Company taxes with penalties and interest in the sum of $4,383.27, and on August 13, 1940, notified Rehg of that fact, and that the same was a lien upon all the property of the Company in the possession or under the control of Rehg and upon any sum he owed the Company. On May 29, 1940, U. R. (Bert) Miller, T. C. (Clyde) Miller, and Charles (Chuck) Miller were indicted in the federal district court of Kansas, the indictment containing eleven counts charging fraud and a scheme to defraud respecting many matters pertaining to the Company, including the plan for the raising of $25,000 in Kansas by the note contracts. On December 15, 1941, each of the defendants entered a plea of guilty to this indictment. (The record is not clear whether this was the

same indictment on which the same parties were tried and convicted and their convictions reversed by the United States Circuit Court of Appeals, see *Miller v. United States,* 120 F. 2d 968, for errors respecting the admission of evidence and in the giving of instructions.)

In the meantime the Company, on May 10, 1939, prepared and served upon Rehg a demand in the form of a letter which reads:

"At a regular meeting of the Board of Directors of The Keystone Copper Mining Company held May 9, 1939, the following Resolution was adopted:

" 'WHEREAS, the contract with Norman Rehg terminated according to its terms, and the Board of Directors, on May 18, 1938, requested the President to notify him to turn over to the Walnut Valley State Bank of El Dorado funds of the Company in his hands, and *whereas* said demand was made by registered letter May 19, 1938, and

" 'WHEREAS, said Norman Rehg has refused to account for said funds received from the sale of contracts amounting to $1,300;

" '*Be it resolved,* that the President of the Company be ordered to make a further demand that said funds be deposited with the Walnut Valley State Bank at once, and upon the failure of Norman Rehg to do so that he be authorized to take all legal steps necessary to collect same.'

"In view of this resolution, I hereby request and demand that you immediately deposit in the Walnut Valley State Bank at El Dorado, the $1,300 you have of the Keystone Copper Mining Company, said funds to be deposited in the name of the Company.

"I would also like an accounting of any other funds you may have of the Company.

.                    "Yours truly,
            (Signed)    "THE KEYSTONE COPPER MINING COMPANY,
                        "By: U. R. MILLER, *President.*"

On August 5, 1939, the complaint on which this prosecution is based was filed, which charged Rehg with the embezzlement of $1,300 of the money of the Company. After a preliminary examination, at which U. R. Miller testified, he was bound over for trial to the district court. Later an information was filed which charged that Rehg, being the financial secretary of the Company, had taken into his possession money and property of the Company of the value of $1,300, of which sum $130 was due him as his lawful fee, charges and commission, and that the balance thereof, $1,170, was the property of the Company, and that defendant feloniously retained and embezzled said sum of money although demand for the return of the same had been made by the Company on May 19, 1938, and on May 10, 1939, and that the sum of $1,300 mentioned represented the sum

of $500 paid Rehg by Metta Robb as the purchase price of a note contract, and the further sum of $800 paid him by J. W. Starkey as the purchase price of a note contract. There appears to have been a trial of the case which resulted in a mistrial. The trial from which the appeal was taken was begun July 8 and concluded July 13, 1942. The motion for a new trial was overruled and sentence was imposed on August 7, 1942.

In the trial of the case the state's evidence adhered very closely to the view that the only matters of importance were the fact that Rehg was the financial secretary of the Company, that he sold these two note contracts as charged, that the Company had made demands upon him for the proceeds, and that he had refused to turn the money over on such demands. Defendant, as a witness in his own behalf, told the story of his connection with the Company much more in detail than the brief summary hereinbefore given and offered additional evidence to support his position. He admitted receiving the $500 from Metta Robb and $800 from J. W. Starkey and testified much more in detail than the summary above respecting his connection with the company, the representations made to him at the time he undertook to raise $25,000 in Kansas on the note contracts, and how he later found that most of the material representations made to him were false. The court took the view that what Rehg learned after demand was made upon him for the money could not affect his action in refusing to turn it over, and therefore was inadmissible. Perhaps because the evidence was quite incomplete respecting the delivery to Rehg of the letter of May 19, 1938, demanding $1,300, and which Rehg testified he never received, the court admitted most of the evidence offered on defendant's behalf respecting what he learned of the fraudulent conduct of the officers of the Company prior to the demand of May 10, 1939, which defendant conceded he received. Evidence of the fact that the Company went into bankruptcy in 1941 listing an indebtedness to Rehg as of May 1, 1938; the fact that the Millers pleaded guilty on December 15, 1941, to the indictment charging them with fraud which involved the sale of the note contracts in Kansas, and other court proceedings, being information received by Rehg after May 10, 1939, was excluded, as was also evidence of facts learned by Rehg, or which occurred, after that date. Most of this excluded evidence was offered by defendant on his motion for a new trial, and quite a little of it was documentary and mentioned in our general statement of facts.

Appellant complains of various rulings on the admission of evidence. We shall notice these only to say it was error to exclude evidence of things which occurred and facts learned by Rehg after May 10, 1939, and which tended to show false representations and fraud of the officers of the Company prior to the time the note contracts in question were sold and of which Rehg had some information on May 10, 1939, which information was confirmed by later events and by information later obtained.

Defendant requested instructions embodying these ideas: That Rehg was entitled to assume the representations made to him by the officers of the Company at the time of his employment respecting the Company's financial condition were made in good faith and to rely upon them in selling the note contracts; and when he learned such representations were false he was entitled to cease his efforts on behalf of the Company and justified in refusing to deliver funds to the Company which he had secured by the use of such fraudulent representations; that if the Company was indebted to Rehg he would be justified in holding funds in his hands belonging to the Company to the extent of such indebtedness, and that doing so would not constitute a crime; that Rehg owed certain duties to J. W. Starkey and others who had confided in him and given him power of attorney to make investments, which should be taken into account; that if at the time a demand was made upon Rehg he withheld money belonging to the Company under a claim of right to do so pending an adjustment or determination of such right he would not be guilty of embezzlement. Defendant also requested instructions outlining his rights and duties under the resolution or contract of March 5 [12], 1938. None of these points was covered in the instructions given. We think it was error not to give an appropriate instruction on each of the points. They embodied in the main Rehg's defense, which he was entitled to have go to the jury.

The instructions given by the court followed closely the theory of the state in the prosecution, namely, that if the money procured by Rehg from Starkey and Robb upon the note contracts belonged to the Company, and if Rehg withheld it after a valid demand, he would be guilty of embezzlement. The jury were told that:

". . . Mismanagement of the property or funds of the Keystone Copper Mining Company by its officers, or the improper conduct of the officers of said company, or the failure of said company to have the title to said property as stated by some of said officers, or any wrongful acts of any of the officers of the company, if the evidence proved such was the case, is not a

legal defense to the offense of embezzlement charged in the information . . . but . . . has been introduced and submitted to you for the purpose of enabling you and assisting you in determining whether or not the defendant in this case had any intent to convert the said property or money to his own use, . . ."

We think the theory on which the court instructed the jury and the limitation placed upon the evidence by the instruction quoted were erroneous. The result of our views respecting instructions refused and given would be to require a new trial. We shall not dwell upon them at length, however, for another question is raised which goes to the very heart of the prosecution.

The prosecution was under that part of G. S. 1935, 21-545, which provides:

". . . if any agent shall, with intent to defraud, neglect or refuse to deliver to his employer or employers, on demand, any money, . . . which may or shall have come into his possession by virtue of such employment, . . . after deducting his reasonable or lawful fees, charges or commissions for his services, unless the same shall have been lost . . . or the employer or employers have permitted him to use the same, he shall upon conviction thereof be punished. . . ."

In the information Rehg's relation to the Company was described as "being an agent, to wit: financial secretary" of the Company, and it was charged that as such agent certain monies, $1,300, came into his hands, of which he was entitled to retain $130 as his commission, "the balance thereof, to wit: $1,170, being . . . the property and monies" of the Company, and that "without the assent" of the Company Rehg feloniously converted the money to his own use, "although demand for the return of said monies, . . . was made . . . on the said 19th day of May, 1938, and on the 10th day of May, 1939, . . ." While the term "financial secretary" was used in the information and at places in the testimony it appears to have been nothing more than a title which he was given, or assumed. It is not used in his contract with the Company of December 7, 1936, and from the evidence it appears Rehg had nothing to do with the general financial affairs of the Company prior to May, 1939, other than to carry out his employment to borrow money for the Company in Kansas on its note contracts. The case was tried on the theory that a proper demand under the statute above mentioned was necessary to be shown before a conviction could be had, and the court specifically so instructed the jury and referred to the demand at several places in the instructions.

Appellant contends that neither of the alleged demands of May 19, 1938, and May 10, 1939, as shown by the evidence was sufficient upon which to base the prosecution, and further contends that under the agreement between Rehg and the Company of March 5 [12], 1938, Rehg was lawfully in charge of the money; that the Company had no right to demand more than $500 at any one time and then only if the daily reports of the operations of the mine and the use the Company was making of money being turned over to it by Rehg showed the money was being used for the purpose for which it was raised, and with respect to that it is contended that Rehg was entitled to exercise some judgment and discretion.

Our cases dealing with demands under this statute clearly show that the demand should be for the amount due and it should be at least reasonably clear and specific. (See *State v. Hayes*, 59 Kan. 61, 51 Pac. 905; *State v. Pierce*, 7 Kan. App. 418, 53 Pac. 278; *State v Eastman*, 62 Kan. 353, 63 Pac. 597; *State v. Eary*, 121 Kan. 339, 343, 246 Pac. 989; *State v. Rush*, 138 Kan. 465, 26 P. 2d 581, and *State v. Taylor*, 140 Kan. 663, 38 P. 2d 680.) But the demand relied upon by the state was for $1,300, when it is conceded that the most due was $1,170. If it were essential to determine the question we would feel compelled to hold that the evidence was insufficient to show that the so-called demand of May 19, 1938, was ever mailed or otherwise delivered to Rehg. Mr. Blood testified that he dictated it in his office in the presence of U. R. Miller, president of the Company. His secretary testified that she took the dictation and typed the instrument, placed it in an addressed envelope and gave it to Mr. Miller, who was supposed to sign and mail it. Miller was not present at this trial, although the state had caused a subpoena to be served upon him in Arizona. His testimony given at the preliminary examination was used, and the county attorney was frank to advise the court in the trial of this case that Mr. Miller could not remember mailing the demand Mr. Blood further testified that it was his "understanding" that it was to be sent by registered mail, and he remembered that a few days later a return card for registered mail, signed by Rehg, came to his office, but he did not know what had become of it nor what had been registered to Rehg. Rehg testified he had never received it. Obviously, the Company did not rely upon it solely, if at all, for almost a year later they made another demand. This, however, contained within it a request for an accounting. The evidence

clearly discloses that at that time the Company owed Rehg $1,500, plus interest, on a note contract, and also tends to show that the Company was otherwise indebted to Rehg in a much larger sum. For the Company to say to Rehg: "Turn over to us $1,300, then let us have an accounting," when the most Rehg owed on the transaction in question was $1,170, and the Company owed him much more, cannot be held to be a sufficient demand for money due.

But, passing all these imperfections of both of the above-mentioned demands, it must be noted that neither of those took into consideration the agreement between the parties of March 5 [12], 1938. The evidence discloses the same had been made because complaints had been made by Rehg of the improper use by the Company of money turned over to it on the proceeds of the note contracts. It evidenced an entirely different method of handling business thereafter. By this contract "the balance of the funds obtainable from the *twenty-five thousand dollar* ($25,000.00) loan" was to be used for placing the mill and concentration plant in operation, to the immediate end that regular smelter return checks might be received by the Company, "and that the balance of the fund shall be held under control by . . . Rehg, and shall be advanced in denomination of *five hundred dollars* ($500.00) as needed, . . . subject to reports showing satisfactory performance of work at the Company's mines. . . ."

This is the contract the parties were working under when Rehg delivered the note contracts to Starkey and to Robb. There is no evidence it was ever abrogated. Under it the Company had no authority to make a demand on Rehg at any time for more than $500, and then only as the money *"was needed,"* as based upon reports of its *satisfactory* use, and under it in the meantime Rehg was entitled *to hold in his possession* and *control* money obtained for the Company on the note contracts. The result is that the Company had no right or authority to make a demand upon Rehg in May, 1938, or in May, 1939, for $1,300, or for $1,170. Such demands, as made, were legally insufficient to form the basis of a prosecution for embezzlement under the statute. What the Company did have was a right to an accounting, which it requested May 10, 1939. There is no contention on the part of the state that a request for an accounting, even if refused, would form the basis for a criminal prosecution.

Since neither of these demands was legally sufficient, and such a

demand is essential before a prosecution under the statute will lie, it seems clear to us that there can be no successful prosecution under the information. Hence, it would be futile to remand the case for a new trial. The judgment of the court below should be reversed with directions that defendant be discharged. (G. S. 1935, 62-1717; *State v. Fisher*, 140 Kan. 511, 520, 38 P. 2d 115.) It is so ordered.

PARKER, J., not participating.