No. 42,007

THE STATE OF KANSAS, *Appellee,* v. WARREN DEWAIN ATWOOD, *Appellant.*

(358 P. 2d 726)

Opinion filed January 21, 1961.

*Robert A. Reeder,* of Troy, and *Louis Kranitz,* of St. Joseph, Missouri, argued the cause, and *Charles L. Davis,* of Topeka, was with them on the briefs for appellant.

*Jack R. Euler,* County Attorney, of Troy, and *Maurice P. O'Keefe,* of Atchison, argued the cause, and *John Anderson, Jr.,* Attorney General, and *Robert E. Hoffman,* Assistant Attorney General, of Topeka, were with them on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: The defendant, Warren Dewain Atwood, was charged with embezzlement as defined in the last clause of G. S.

1949, 21-545. The amended information alleged in substance that on November 15, 1958, the defendant was the collecting agent of R. C. Twombly, doing business as Twombly Grain Company; that by virtue of his employment he collected the sum of $744 from Hugh Gilmore in full payment and satisfaction of a debt Gilmore owed Twombly; that as a result of said collection there was due and owing Twombly the sum of $496 and that the balance thereof, or $248, represented the fee or commission due the defendant for having made the collection, and that the defendant, with intent to defraud and convert the said sum of $496 to his own use, failed and refused to deliver the said sum to Twombly upon demand. Trial was by a jury which found the defendant guilty of the crime of embezzlement, and, following the overruling of the defendant's motions in arrest of judgment and for a new trial, sentence was imposed pursuant to G. S. 1949, 21-534 third. Hence this appeal.

Pertinent portions of the evidence are summarized: R. C. Twombly operated grain elevators at Troy and Highland under the firm name and style of the Twombly Grain Company. The elevator at Highland was managed by Harold Twombly, R. C. Twombly's brother. The defendant was a bill collector and did business as a collection agency under the firm name and style of Adjusters of Delinquent Obligations. He lived at Elwood which is about ten miles from Troy and about twenty-five miles from Highland.

On or about August 29, 1958, R. C. Twombly contacted the defendant about collecting some of his past-due accounts. The defendant told Twombly he would collect the accounts and charge a commission of one-third of the amounts collected. Twombly turned over some accounts to the defendant and told him to go to Highland and get other delinquent accounts to collect. Twombly telephoned his brother at Highland and asked him to give the defendant some of the delinquent accounts. Among the total of nine accounts delivered to the defendant were the accounts of Hugh Gilmore and one Franken. Gilmore, a farmer and stock feeder, lived on a farm near Highland and traded at Twombly's elevator at Highland where he owed a delinquent account in the sum of $744. The bookkeeper at the Highland elevator was Twombly's sister and she signed R. C. Twombly's name to a paper referred to as defendant's Exhibit A, hereafter set forth.

The defendant went to Gilmore's farm on September 3, 1958, and told him he was a collector and had a bill which the Twombly ele-

vator assigned to him for collection in the amount of $744 and that if payment was not made, suit would be commenced against Gilmore. Gilmore is supposed to have told the defendant that he owed the elevator some money but there was something wrong with the bill. The defendant stated he was not authorized to correct the account, that Twombly was the only one who could do so, but that if Gilmore paid the account he would take it up with Twombly and he would refund the money if the account was not correct. The defendant also promised Gilmore he would furnish him with an itemized statement of his account. Gilmore gave the defendant his check in the sum of $744 which promptly "bounced."

On September 12, 1958, the defendant went back to Gilmore's farm and told him "we have got to do something about that check." Gilmore stated he was not satisfied with the account, but he gave the defendant another check for the full amount. Upon Gilmore's inquiry whether he had obtained the ledger sheets, the defendant stated he had not and reiterated that Twombly would have to make any correction since all he was supposed to do was to get the money, but that if the account was incorrect Gilmore's money would be refunded. The defendant testified that he cashed Gilmore's check the next day; that he did not deposit the money but carried it in his pocket, and that he did not tell Twombly he had collected the amount of the second check because he knew he would have to make a refund to Gilmore. He further testified that on that day or the next day he went to the Highland elevator and asked the bookkeeper if she would give him the ledger sheets; that he did not return the ledger sheets to Twombly because he did not know who they belonged to, that he supposed they belonged to Hugh Gilmore because they had his name on them, and that during the middle of September he mailed the ledger sheets to Gilmore. It should here be noted the bookkeeper denied she gave the defendant the Gilmore ledger sheets, and testified she had been unable to locate them after the defendant visited the elevator one day.

On October 8, 1958, the defendant went to Highland on some business, the details of which, or whom he was going to see, he could not remember. While seated in his car in front of a restaurant not waiting for anyone in particular, he happened to see Gilmore who told him he was not satisfied with the bill; that he had been overcharged, and the defendant and Gilmore both testified that the defendant gave Gilmore $744 in one-hundred-dollar bills,

some tens and some ones, and Gilmore gave the defendant a receipt for that amount. Gilmore testified he did not contact Twombly and offer to pay him anything, but put the $744 in his pocket and spent it for expenses.

One peculiar facet of the receipt was that it was prepared in longhand by the defendant's wife at their home in Elwood before the defendant went to Highland, notwithstanding the fact that he testified he knew nothing about the correctness of the account and despite the fact that he had told Gilmore he was just to collect the account and that any corrections thereon would have to be made by Twombly. Another peculiar facet was that Gilmore's account with Twombly had been running since 1956; he had received monthly statements showing the balance; he had never disputed the correctness of the amount and had paid $100 in April 1957, $100 in May 1957, and had made a payment in January 1958, some eight months prior to the time Twombly turned the account over to the defendant for collection, all of which the jury apparently took into consideration.

Gilmore testified that Harold Twombly came out to see him about his account on two occasions, one being on July 17, 1959; that he told Twombly he had paid the account in full to the defendant and had his cancelled check, and that he did not tell Twombly he had been refunded his money because the Twomblys "had overcharged me, and I thought they could find it out the best way they could, they didn't treat me right and if they wanted they could do as they please."

In November 1958 R. C. Twombly, after hearing of the defendant's collection from Gilmore, saw him on the street in Troy and the defendant told Twombly he had collected $300 on the Gilmore account but had not collected anything on the Franken account. When Twombly asked him to settle up, the defendant stated he did not want to settle until he made full collection. Twombly insisted on immediate settlement but the defendant said he could not settle right then but would get a check from "the company" which would take a couple of days. The defendant did not come to settle but wrote Twombly that he would come down on a certain day, but he never showed up.

On July 17, 1959, R. C. Twombly, with his wife and son, went to see the defendant at his home in Elwood and demanded settlement of the Gilmore account. (This visit was made in the evening of the same day that Harold Twombly saw Gilmore in the after-

noon.) The defendant told him he had not collected any money from Gilmore and that he had given the bad check back. He further told Twombly that he had not collected anything on the Franken account, but after his arrest and the preliminary hearing in the instant action he sent Twombly a check for $162.50 representing one-half of what he claimed he collected from Franken.

The sheriff of Doniphan County testified that he was at his brother's filling station in Elwood the day following the defendant's arrest and that the defendant voluntarily stated Twombly and his wife had been down to see him the Friday night before in regard to the Gilmore account; that Twombly asked him if he had collected any of the money and the defendant told him he had collected the bill; that when Twombly asked him if he did not think he ought to get his part, the defendant replied that was not the agreement—"the agreement was we get to keep it all."

The defendant first contends that the trial court erred in overruling his demurrer to the state's evidence and his motion for a directed verdict and for discharge at the conclusion of the state's case in chief. He asserts that Twombly's unpaid account against Gilmore was assigned and transferred to "Adjusters of Delinquent Obligations," and that the assignment (defendant's Exhibit A) vested in the appellant such an ownership interest in the unpaid account that he could not in law be guilty of embezzlement. He maintains that embezzlement cannot be committed by a person with respect to money or property of which he has the legal ownership or in which he has a legal interest, and that where, as here, the creditor-principal assigns and transfers the account to a collector, placing ownership thereof in the collector, with the collector authorized to retain or deduct his commission, paying over the balance only, there can be no embezzlement within the meaning of G. S. 1949, 21-545, and cites and relies upon *McCubbin v. City of Atchison*, 12 Kan. 166; *Parli v. Reed*, 30 Kan. 534, 2 P. 635; *James Clark & Co. v. Wiss & Ballard*, 34 Kan. 553, 9 P. 281; *Rullman v. Rullman*, 81 Kan. 521, 106 P. 52; *Robertson v. Robertson*, 100 Kan. 133, 163 P. 655; *Turner v. Williams*, 114 Kan. 769, 221 P. 267; *Chatterton v. Clayton*, 150 Kan. 525, 95 P. 2d 340, and *Miller v. Keeling*, 185 Kan. 623, 347 P. 2d 424.

For the benefit of the reader defendant's Exhibit A has been reproduced and reads:

## Adjusters of Delinquent Obligations

REPRESENTATIVES EVERYWHERE

Date _Aug 29_, 19_58_

In consideration of the services to be rendered the following correct and unpaid claims due us are placed with you, subject to your discretion in settlement, and in accordance with the terms printed ON THE BACK HEREOF; they are signed and transferred to the A. O. D. O. and I give all my rights and interest in the accounts.

Firm Name _Twombly Grain Co_

(Client sign here) please use ink _R C Twombly_

P. O. _Gray_ , State _Kansas_

Solicitor_____

Kind of Business _Grain Elevator_

| Name of Debtor | Be sure to give full name and title (Mr., Mrs., Miss, etc.) | Be sure to give street and number, and where Debtor is Employed. Drop a line and give all other information | Town | State | Date of Last Item | Amt. Due |
|---|---|---|---|---|---|---|
| 1 _Hugh Gilmore_ | | | _Highland Ks_ | | 1/9/58 | 744 06 |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |

IMPORTANT — List no accounts that you could not swear to. Claims against persons of unknown address, bankrupts, minors and unsatisfied judgments are not acceptable.

A confirmation of this list will be promptly sent to you.

_Aug 29 hold till 10 Sept see him Befor cashing check._

(The defendant testified that the writing in longhand at the bottom of the exhibit, "Aug. 29, hold till 10 Sept. see him befor cashing check" was written by him upon instructions by Harold Twombly when the account was delivered to him.)

On the back of the foregoing instrument was the following printed language which was "X'd" out:

"No charge of any kind if there is no collection, except accounts of unknown address, then there is a charge as same as collection.

"The creditor is not liable for any of the company's disbursements incidental to collection, except as stated on reverse side.

"Thirty-three and one-third per cent (33⅓%) on accounts up to five years old which are settled and paid.

"Those under $10.00, those over five years old, forwarded accounts and those paid in installments, 50%.

"Commission is charged on all accounts collected, settled satisfactorily, withdrawn or ordered dropped during process of adjustment, or placed into acceptable notes.

"It is understood we are authorized to endorse for deposit and collect such commercial paper as we may receive, made payable to the Creditor, in settlement of accounts listed.

"Claims not in process of adjustment released in 30 days upon written request.

"Note: We are the Legal owners of these claims.

ADJUSTERS OF DELINQUENT OBLIGATIONS

Clearmont, Missouri                           Elwood, Kansas"

The defendant's contention is not well taken. The evidence was undisputed that Twombly placed the Gilmore account with the defendant for collection on the basis that he retain or deduct a commission of one-third when the account was collected and remit the balance to Twombly. The defendant did not dispute that, and on cross-examination testified that if collection was made he was to retain only one-third as his commission. It was that arrangement which constituted the agreement between the parties and the defendant could not under such agreement claim ownership of any part of the account or its proceeds over and above his commission.

The appellant is not charged with embezzling all the money he collected on the Gilmore account but only Twombly's two-thirds share, or the sum of $496. Assuming, but in no sense deciding, that defendant's Exhibit A effected a valid assignment of the Gilmore account to the defendant, parol evidence was admissible to show that the assignment was made for collection only and that Twombly still had an interest in the account. The contract was that the defendant was to take the account, collect it, and when collected, retain one-third as his commission and pay over the remaining two-thirds to Twombly. In *McWhirt v. McKee*, 6 Kan. 412, it was held:

"Where a note is assigned in writing on the back thereof, it is competent for the original payee of the note to show by oral testimony that the note was assigned for collection only, and that the party to whom it was delivered agreed to collect the note and to pay over its proceeds when collected." (Syl. ¶ 1.)

In the opinion it was said:

". . . The oral testimony does not contradict the assignment; does not vary it; does not even explain it. The contract was outside of the assignment, and was parol in its character, and therefore could be proven by oral testimony. The contract was, that McWhirt was to take the note, collect it, and when collected, pay it over; and all this was in parol. The 'assignment' formed no part of the contract, and was only made to assist McWhirt in the performance of the obligation he took upon himself by reason of the contract." (1. c. 418.)

A number of cases follow this rule; a few of them are *Hamilton v. Whitson*, 5 Kan. App. 347 48 P. 462; *Robinson's Executors v. Blood's Heirs*, 64 Kan. 290, 67 P. 842; *Bank v. Schaefer*, 102 Kan. 868, 870, 171 P. 1159; *Berg v. Scully*, 120 Kan. 637, 245 P. 119, and *Fulmer v. Hallbauer*, 178 Kan. 535, 289 P. 2d 771.

In *Commonwealth v. Willstein*, 146 Pa. Super. 357, 22 A. 2d 613, the appellant was given a written assignment absolute on its face

of a judgment for $2800 on which she collected $1600 and converted it to her own use. She was tried and convicted of fraudulent conversion. She contended that the assignment of the judgment to her, being absolute on its face, made her the owner and thereby prevented her prosecution for the offense. It was held that the judgment owner's parol evidence was admissible to show that the defendant represented she was in a position to collect the judgment and that the assignment was made for that purpose. In the opinion it was said:

". . . It is always possible in this State to show by parol evidence that a judgment was confessed as collateral security, or that a transfer or assignment of personal property, including a judgment or mortgage, absolute on its face, was delivered as collateral security, or for collection, etc. It is done every day in banks' and broker's offices. To hold otherwise would disrupt business as ordinarily carried on. To require the full transaction to be set out in the assignment or transfer would often defeat its purpose, and hence would not be expected to be embodied in it. . . . The evidence produced by the Commonwealth was sufficient to meet the requirements necessary to establish that the assignment was only for collection." (p. 360.)

See, also, *Patterson v. United States*, 39 App. D. C. 84, and *Commonwealth v. Schuster*, 158 Pa. Super. 164, 44 A. 2d 303.

The gist of the offense of embezzlement is the withholding of money or property with intent to defraud the owner, or to deprive him of the use and benefit of his money or property, and convert or apply the same to the defendant's own use or benefit. While a defendant cannot be convicted of embezzling money or property where he has title and ownership of the money or property alleged to have been converted (*Parli v. Reed*, supra), he may be prosecuted and convicted of the offense where title was conveyed or assigned to him solely for the purpose of collection or sale for the benefit of the owner (*Commonwealth v. Willstein*, supra; *Commonwealth v. Schuster*, supra; *Patterson v. United States*, supra).

As previously indicated, the defendant was charged with embezzling only the sum of $496, representing Twombly's two-thirds part, and without further discussion we are of the opinion there was ample evidence to show that the defendant was Twombly's agent within the meaning of the last clause of G. S. 1949, 21-545 to effect collection of the Gilmore account, and to support the jury's verdict finding him guilty of embezzlement as charged in the amended information.

The defendant next contends he refunded the entire amount of Gilmore's account, hence no funds were available for conversion to

his own use. The contention is based upon the premise that Gilmore was not indebted to Twombly, and that the facts did not form the basis for the crime of embezzlement. The short answer to the contention is that the testimony of the defendant and Gilmore was before the jury for its consideration together with all the other evidence introduced, and, after being properly instructed by the court, the jury chose not to believe their testimony.

The defendant makes the point that Twombly's demand was in a sum larger than was due and was insufficient to warrant the charge of embezzlement, and relies upon *State v. Rehg*, 157 Kan. 203, 139 P. 2d 838. The argument is made that the defendant collected from Gilmore upon Twombly's misrepresentation that Gilmore's account was correct and past-due, hence the defendant had the right, under his agreement with Twombly, to withhold the money and refuse to pay it over and that he acted under that claim of right; further, that he even went so far as to refuse to be a stakeholder, and returned Gilmore's money thus restoring Twombly and Gilmore to *status quo*. The point is not well taken.

We think the evidence warrants a conclusion that Twombly's demands upon the defendant were sufficient. On November 15, 1958, after learning Gilmore had paid his account, Twombly insisted that the defendant settle with him, but he was put off. Later, in July, 1959, Twombly again demanded that the defendant account to him for his part of the Gilmore collection. Again, the defendant refused. Those facts were sufficient to form the basis for the charge in this case. Moreover, the element of actual misapplication of the proceeds of the Gilmore account was established beyond any doubt by the defendant's unique defense as revealed by his own testimony and that of Gilmore making proof of demand unnecessary.

The defendant next contends that evidence of collections made by him and not paid over to merchants and retailers in other counties should not have been shown since some of those transactions resulted in his being arrested for obtaining money by false pretenses in violation of G. S. 1949, 21-551. Evidence was admitted over the defendant's objection that in carrying on his business as a bill collector in other counties, several merchants and retailers delivered delinquent accounts to him for collection, but, try as they might, they were unable to collect their share after the defendant had effected collections. Typical of that evidence is

the case of Harry Boyce. Boyce was a merchant at Valley Falls in Jefferson County and the defendant went to his store and wanted to collect any delinquent accounts he might have. The defendant stated he was government bonded and could not collect any accounts unless Boyce signed a paper similar to defendant's Exhibit A. The defendant told Boyce he would charge one-third of what was collected and there would be no charge for accounts without addresses since they were not acceptable. One of the accounts given the defendant was that of James Fulton in the amount of $147. After considerable time had elapsed, Boyce learned that Fulton had paid the defendant $110 on his account. When Boyce finally caught up with the defendant he asked him whether he had made any collections and the defendant told him he had not. Boyce told him he knew he had collected $110 from Fulton and the defendant stated he would have to check his books to make sure. Shortly thereafter, the defendant wrote Boyce advising that Fulton had paid $110 on his account and that the defendant owed Boyce $55 after deducting his commission of one-half. In the same letter the defendant had the effrontery to state that Boyce owned him $117.25 for accounts given with addresses unknown and for those in the process of collection, and that "we owed you $55, deducting what we owe you, from what you owe us ($117.25), leaves you owing us a balance of $62.22," and asked Boyce to send his check by return mail for that amount. The letter further stated, "consider your accounts canceled & work stopped upon them."

The conduct of the defendant toward Boyce was characteristic of his dealings with the other merchants who testified. All of them had trouble collecting or attempting to obtain their money from the defendant. We think the evidence was relevant to prove the guilt of the defendant of the crime with which he was charged since it tended to prove guilty knowledge, intent, inclination or motive, and to prove his scheme or system of operation. (*State v. Myrick,* 181 Kan. 1056, 1059, 317 P. 2d 485; *State v. Handke,* 185 Kan. 38, 45, 46, 340 P. 2d 877.)

The defendant complains that the county attorney and the special prosecutor did not abide by the trial court's ruling that the state could show the defendant's transactions with various merchants in other counties but that in so doing reference should not be made to the fact that a criminal charge was filed or that the defendant

paid the amounts due. We are convinced that, after a careful examination of the record, the contention is not meritorious. If there was error as claimed, we think it was cured when counsel for the defendant asked the defendant whether he had been arrested in Jefferson County concerning collections accounts to which he answered he had been, but that the case was dropped after he paid the accounts.

The defendant next contends the appearance and conduct of a special prosecutor was irregular, prejudicial, and constitutes reversible error, relying upon G. S. 1949, 19-719. R. C. Twombly was the prosecuting witness and at his own expense employed Maurice P. O'Keefe, a member of the Atchison County Bar, as special prosecutor to assist the county attorney in the trial of the defendant's case.

The statute the defendant relies upon was enacted as Laws of 1903, Ch. 66, which contained two sections now appearing as G. S. 1949, 19-718 and 19-719. Those sections authorize the district court in any county having less than 10,000 population, in its discretion and upon application of the prosecuting witness, to appoint an attorney or attorneys to assist the county attorney, causing a record of the appointment to be made upon the journal of the court where the prosecution is pending. When it is shown that services were rendered by the attorney under the appointment, the board of county commissioners are required to allow and pay to the attorney from the general fund of the county, reasonable compensation for his services. (*Vernon v. Edwards County Comm'rs,* 132 Kan. 119, 294 P. 871.) That, clearly, is not the situation presented.

The statute under which Mr. O'Keefe was appointed (G. S. 1949, 19-717) authorizes the prosecuting witness in any criminal action, at his own expense, to employ an attorney to assist the county attorney in the performance of his duties, and the attorney employed shall be recognized by the county attorney and the court as associate counsel in the action or proceeding. No valid claim may be made that Mr. O'Keefe was not a duly appointed associate counsel as authorized by that statute, nor that he took virtual control of the case—the county attorney prepared the case for trial, interrogated at least half of the witnesses, made one of the closing arguments, and was in full control of the prosecution at all times.

The defendant lastly contends it is essential to the crime of embezzlement that intent to defraud be proved, and suggests that

no such intent was established. We are not persuaded. Without reiterating all of the testimony, suffice it to say we think that the evidence was more than ample to convince the jury of the defendant's intent to defraud, and warranted the trial court's approval of the verdict of guilty.

We have thoroughly reviewed the record and finding no reversible error, the judgment of the trial court is affirmed.