No. 42,616

THE STATE OF KANSAS, *Appellee*, v. LILLIAN P. WOOD, *Appellant*.

(365 P. 2d 1080)

Opinion filed November 10, 1961.

T. R. Liebert, of Coffeyville, argued the cause, and *Frank W. Liebert*, of Coffeyville, was with him on the briefs for the appellant.

*Willis K. Dillenberger*, assistant county attorney, argued the cause, and *William M. Ferguson*, attorney general, and *Oren Gray*, county attorney, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Robb, J.: This is an appeal by defendant from a conviction of mayhem under G. S. 1949, 21-430, and sentence and commitment to the Kansas Industrial Farm for Women pursuant to G. S. 1959 Supp. 76-2505.

The first count of the information was couched substantially in the language of G. S. 1949, 21-430, to the effect that defendant on or about December 25, 1959, in Labette county, Kansas, did willfully, unlawfully, feloniously, on purpose and of malice aforethought, maim, disfigure and disable the limbs and hand of Fred Stegmeir, by breaking his right wrist and his left hand. The second count alleged the commission of felonious assault in violation of G. S. 1949, 21-431, which count was dismissed by the state at the trial and need not be restated or considered here. Therefore, the sole remaining charge was mayhem.

The first witness for the state was Doctor John P. White who saw Stegmeir between 1:00 and 2:00 p. m. on December 30, 1959. Doctor White stated that Stegmeir's condition at that time was one of weakness, shock, neglect and malnutrition. He thought Stegmeir had been involved in some sort of a terrific trauma or an accident. Stegmeir's head was severely bruised, and both hands and wrists appeared to have been crushed but it was not his concern as to how it happened. He informed defendant that Stegmeir had to go to the hospital or he was going to die, and he would probably die anyway. Defendant stated she was his nurse and would not grant the permission. Later that afternoon defendant called Doctor White stating, ". . . they had decided she would let him go to the hospital," and according to Doctor White's directions she sent Stegmeir to Mercy Hospital just outside of Parsons.

Doctor White further testified, "I do have a judgment as to how his wounds could have been inflicted, by some manner, of which I am not stating . . .," and Doctor White, in answer to a question as to any distinctive or unusual marks he noticed on Stegmeir's body answered, "Yes. He was beaten, and had bruises—" and then he went on with the qualifying remark, "I did not state . . . how . . .," and the next answer was that Stegmeir had multiple contusions, abrasions, lacerations and ecchymosis on the head, arms, and wrists which appeared to be about one week old. There were peculiar marks on the wrists and swelling, but no other marks

on the body. The wrists appeared to have a great amount of swelling which could have been caused by constriction. The deformity of the hands was partially due to the fracture of both wrists and hands and partially due to constriction of both wrists. Pictures of Stegmeir which had been taken after Stegmeir's death were identified by Doctor White.

Objection to any reference to the pictures was made by defense counsel and was overruled by the trial court. Doctor White continued that he had not seen Stegmeir after his death but markings on decedent's head were not any different from the injuries he saw on his first call when Stegmeir was alive *except for the changes that occur in death.* Defendant again objected to any reference to the pictures and was again overruled. On cross-examination the witness testified that Stegmeir was eighty some years old, that he was suffering from diabetes and he could be bruised and injured very easily in a little fall or anything like that, so hitting an object which might not affect an ordinary person would cause an injury, or a black and blue spot, to Stegmeir because diabetics are more inclined to suffer bruises, contusions and lacerations than an ordinary person. Defendant had told Doctor White that Stegmeir had been caught in a car door sometime prior to the time Doctor White first saw him.

Doctor Joseph Waxse, county coroner, saw the body of Stegmeir on the morning of December 31, 1959, at a funeral home and corroborated the testimony of Doctor White as to the appearance of the hands and wrists. The marks looked about a week old. Over the objection of defense counsel, the pictures taken subsequent to Stegmeir's death were submitted to and testified about by Doctor Waxse. On cross-examination, Doctor Waxse stated the constrictions around the wrists appeared to be due to something tight, like a heavy cord, having been applied to the wrists. He further testified the actual cause of Stegmeir's death was bronchial pneumonia which is characteristic in elderly people.

Detective Harold Floyd, over objection of defense counsel, testified with respect to the pictures and also that he had requested Leon Crooks to take them. He, along with two other officers, went to defendant's home on December 31, 1959. They found no one at home and they forced their way into the house. One of the other officers pulled a small bat and a stick out from under a cabinet and handed them to the witness. This testimony was allowed to stand

and the exhibit marked over the objection of defense counsel. The witness apparently volunteered the statement that at the time he had had the bat in his possession, it contained a small amount of blood on it. Defense counsel objected and the court ruled, "Sustained, at this time." In response to the next question witness stated, "It had some stain on it, yes, sir." The bat was marked exhibit 7 and the stick was marked exhibit 8. Before Officer Floyd testified about the stick, defense counsel objected to its relevancy and was overruled. The stick was identified as the one removed from the house along with the bat. Another objection was made on the grounds of hearsay and was overruled by the court. An attempt was made on the part of the state to get into the evidence testimony regarding blood stains but because of good and sufficient objections by defense counsel, which were sustained by the trial court, it was unable so to do. Officer Floyd together with Glen Hedrick, a deputy sheriff, went to Fredonia about January 2, 1960, in an attempt to locate defendant and her daughter but did not find them there. Hedrick testified that on January 4, 1960, defendant and her daughter, registered under the names of Mrs. Grace and Mary Jones, were located at Gill's Motel in Girard in Crawford county, and they were returned by Glen Hedrick to the jail at Oswego. Hedrick had helped in the search of defendant's house which he said was "full of junk and was a shack" and that he could hardly get around for all the junk that was piled inside the house.

Officer William Raney, who accompanied the previous witness Floyd to defendant's home, testified that in his search of defendant's house he observed a small baseball bat and a "length of sapling" down between the wall and dresser propped up at an angle and what attracted his attention to them was the fact that one of them had a stain on it and he handed them to Floyd.

Leo Warren testified that one day about 5:00 p. m. during Christmas week he had assisted in pushing defendant's car to get it started and that Stegmeir had pushed at the side of the car. The door was open and struck a water plug as the car was pushed by. Stegmeir's head was hurt in the process. The witness had pushed the car from the rear but he saw Stegmeir's head was bleeding. The door had apparently closed on him and he saw blood on Stegmeir's head. He just knew about the head. It was bleeding pretty close to the ear but he did not remember which side. Stegmeir stood up and pulled his handkerchief out of his pocket and held it up to his bleeding head.

Russell A. Gilliland testified that defendant's attorney, Ben Humphreys, reserved a motel unit for defendant and her daughter and gave the names for the reservation under which the defendant and her daughter registered on January 4, 1960.

Testimony of Harry L. Buckley showed that from his room on the second floor of the house next door to defendant's home he had heard cursing by a voice which he thought he could recognize as belonging to defendant. Such cursing happened practically every night and he had seen Esther, defendant's daughter, push Stegmeir and poke him with a stick but he was not sure it was with exhibit 8, the stick in question. He knew defendant had a mean disposition.

Thereupon the state rested. Defendant moved that she be discharged, which motion was by the trial court overruled.

Defendant then presented her evidence. Her first witness was Alvin Selle, deputy sheriff of Crawford county and jailer at Girard, who stated that defense counsel had informed him at 4:40 p. m. on January 4, that he would produce defendant whenever she was needed. At 4:41 Selle called the Labette county sheriff, and at 4:52 that sheriff called that they were on the way with a warrant for defendant. At 5:30 p. m. there was another call from the Labette county sheriff stating he would secure a warrant for defendant and get it to Crawford county. According to the record, testified to by Selle, which was more or less in the form of a radio broadcast, at 9:15 p. m. on January 4 a state warrant had been issued for defendant and also one for her daughter, Esther Wood. On January 5, 1960, the sheriff of Labette county brought a warrant to Crawford county.

On cross-examination Selle testified that when defense counsel called him at 4:42 on January 4, Selle did not know defendant was wanted and that between January 5 when the warrant was brought to Crawford county, and January 7, he was looking for a "Black 1942 Chevy, Neosho County Tag 4616," as stated in the warrant, because he did not know defendant. At 8:00 a. m. on January 5 defense counsel was in Selle's office and wanted to know what was wrong with the Labette county sheriff but Selle did not know.

The second witness for defendant was Morris Whitman, chief of police at Girard, who testified that defense counsel had told him he knew where defendant was, and in a later conversation with that same counsel, he told Whitman to "Let the County pick her up."

Defendant testified that Stegmeir was eighty-one years of age and

had sugar diabetes, Bright's disease, and either lumbago or rheumatism. She had leucoma. She was blind in one eye, partially blind in the other, and the doctors had told her she was losing her eyesight completely. Stegmeir had broken his right wrist, or something was wrong with his right hand, and then later on something was wrong with his left hand. She stated, "They were tied with a kind of a crude-made splint to kinda keep his medicine on, and to hold them so they wouldn't turn under so." A sling to go around his neck was made out of an old cord such as drygoods are wrapped with and there was a bandage around his wrists.

Stegmeir was in quite a bit of pain. An old torn piece of sheet had been used for the first sling but he was so strong he broke it so often they had to resort to the cord. She soaked his wrists in epsom salts, K-3 liniment, and put turpentine and lard on them. She thought he had hurt his right hand while trying to put up a storm door with her help and that of her daughter. Defendant testified that on another occasion her daughter told her Stegmeir hurt his hand while working on a tire. She corroborated the testimony of Leo Warren in regard to the injury Stegmeir received from pushing the car, and the fact that Stegmeir's head was bleeding. Her daughter was screaming and they helped him into the house.

Defendant wanted to call the doctor but when she asked him if they should call a doctor, Stegmeir began to curse doctors and told her "No." She kept repeating, "We must call the doctor." Later they went to the grocery store to get some of Stegmeir's candy bars, as he requested, and while they were in the store, his ear started bleeding again and one of the lady checkers offered to help but Stegmeir took defendant's handkerchief and removed the blood from his face. They returned home and prepared supper but all he wanted for supper was his candy bars. She was going to bathe his hand in hot epsom salts water and wanted to call a doctor but he did not want to call the doctor because he would have to go to the hospital and he recalled a time when he had had a Doctor Morrow and had had to go to the Katy hospital and be operated on. He did not want any operation. He again cursed the hospitals, nurses, and doctors, and refused to let her call a doctor and when she started to use the telephone, he grabbed it out of her hand and threw it on the floor. Defendant denied that she had ever hit Fred Stegmeir.

Defendant's daughter, Mary Esther Dixon, testified she was seven

years of age when Fred Stegmeir began rooming and boarding with them. She had taken care of him whenever he got hurt. She thought he had broken his arm and she made a splint out of cardboard, cotton and cloth and tied it on with a cord-like rope.

She corroborated the car pushing incident and the fact that she had "hollered" at the time because she thought Stegmeir was dead. His right hand began to swell and she made the splint. Stegmeir had injured his hands while changing a tire and again when putting up a storm door. She denied she had ever seen her mother strike Fred Stegmeir. She tried to call a doctor but Stegmeir would not see a doctor. She could not get him into the car to go to a doctor. Every time he would get hurt she would try to have a doctor but he would neither go to one nor see one. She testified about calling Doctor White. She called the Edwards ambulance. She said it was not Stegmeir's choice to go to the hospital. Her testimony on that point was:

"Q. Did he object at that time to going to the hospital? A. Yes, the young man that was there will tell you about that."

The witness and her mother, although they knew Stegmeir was very much against it, still took him to the hospital.

Defendant rested, and then read into the record a motion for the court to order and direct the jury to return a verdict of not guilty for the reason that the state by its evidence had failed to prove the commission of the crime as alleged and charged in the information. The trial court overruled the motion.

The first claimed specification of error is that the trial court erred in overruling defendant's motion to discharge and motion for a directed verdict. The evidence of the state has been set out herein in considerable detail. At the time of the motion for discharge there was an inference that defendant and her daughter had gone from their home in Parsons (Labette county) to Girard, in Crawford county, and that this was flight. However, upon the opening of defendant's testimony it was quickly shown that before any warrant was issued for defendant, she had discussed her situation with her attorney, who had made the arrangements for her and her daughter to go to a motel in Crawford county and had directed her to go there. On January 4, 1960, her attorney had informed the sheriff in Crawford county that he knew where defendant was and would deliver her if and when a warrant was received. This information was relayed to the sheriff of Labette county. However, no warrant

was issued until the next day, January 5, 1960. There is no evidence before this court that any other warrant was ever issued for defendant. She had a right to employ counsel and abide by such counsel's advice and direction (Bill of Rights, § 10, Kansas constitution) so that under these facts there was no flight from which a confession or presumption of guilt could be inferred.

The state had the duty and burden at all times to prove each and every element of the crime charged under G. S. 1949, 21-430, the material portions of which read:

"Every person who shall, on purpose and of malice aforethought . . . disable any limb or member of any person, with intent to . . . maim or disfigure such person, shall upon conviction be punished by confinement and hard labor for a term not less than five nor exceeding ten years."

See, also, G. S. 1949, 62-1439; *State v. Fisher*, 140 Kan. 511, 520, 38 P. 2d 115; *State v. Rehg*, 157 Kan. 203, 217, 139 P. 2d 838; 2 Hatcher's Kansas Digest, rev. ed., Criminal Law, § 195, p. 226.

Further, there is no evidence before this court from which it can be inferred that anyone disabled Stegmeir's wrists, or hands, or any of them. The only evidence produced was that of the defendant which showed that Stegmeir had injured his wrists and hands on several occasions, two of which have been set out herein, and testified to by the defendant and her daughter. There is no proof by the state, even circumstantial (4 West's Kansas Digest, Criminal Law, § 552 (3'); *State v. Ragland*, 170 Kan. 346, 226 P. 2d 251; *State v. Bailey*, 184 Kan. 704, 711, 339 P. 2d 45), nor is any to be gleaned from the evidence of defendant, that anyone disabled any limb, or, as stated in the charge of the information, "by breaking the right wrist and the left hand of said Fred Stegmeir," and further, there is a total lack of any evidence that defendant ever threatened such bodily harm to Stegmeir. The cursing and name-calling shown in the record could not be sufficient to establish a threat of, or the element of maiming or disfiguring set out under the requirements of the statute to constitute a violation thereof.

Because of such failure on the part of the state to prove any act of another to maim or disfigure, or to disable, any limb or member of Stegmeir's body, we have no alternative other than to reverse the judgment of the trial court and under G. S. 1949, 62-1717, to direct that it discharge the defendant. It is so ordered.