No. 73,991

STATE OF KANSAS, *Appellee,* v. SHARI WEBBER, *Appellant.*

(918 P.2d 609)

Opinion filed June 7, 1996.

*J. Douglas Miller,* of Miller, Diepenbrock & Goertz, P.A., of Liberal, argued the cause, *Linda W. Powell* and *Daniel H. Diepenbrock,* of the same firm, were with him on the briefs for appellant.

*Wayne R. Tate,* special prosecutor, argued the cause, and *Chris O. Concannon,* county attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Shari Webber appeals her convictions of one count of aiding and abetting first-degree murder, K.S.A. 21-3401, and one count of conspiracy to commit first-degree murder, K.S.A. 21-3302; 21-3401, in connection with the March 26, 1994, shooting of her husband, Scott Webber, by Shari's boyfriend, Victor Bansemer. Shari was given a hard 40 sentence.

Scott's body was found on the floor of his trailer house in Hugoton, Kansas, on March 28, 1994. The shots resulting in his death were fired from a distance of 2 feet or less.

Evidence presented at trial showed that Shari wanted Scott killed to resolve an ongoing custody dispute and avoid the accompanying legal fees. Toward that end, the State introduced evidence showing the status of Shari's custody battles with both Scott and her ex-husband, Jeff Diseker, regarding her children Dalyn and Chloe.

Shari sued Scott for divorce on January 10, 1994. An order placed the couple's child in Shari's custody and placed supervisory conditions on Scott's visitation. The restrictions stemmed from Scott's alleged use of marijuana. On January 31, 1994, Scott moved to modify the visitation restrictions, which were removed at a February 2, 1994, hearing.

Diseker had been pursuing a motion to change the custody of a minor child from his marriage with Shari since late 1993. Earlier in 1993, Diseker and Shari had a dispute over visitation. Diseker's March 17, 1994, motion to modify custody was set for hearing on March 25.

Police arrested Bansemer for the murder of Scott on May 18, 1994, based on statements he had made to a friend, Esther Cox, which she reported to law enforcement officers. In one interview, Cox reported that Bansemer had told her that Shari said she would kill Scott if Bansemer would not.

During interviews with law enforcement officers, Shari denied any knowledge of the circumstances surrounding her husband's death, denied having dated Bansemer, denied they were sexually involved, and denied they had ever been engaged. Evidence from numerous sources at trial contradicted these claims.

Two days after his arrest, Bansemer told his lawyer the murder had been a joint venture between himself and Shari. After Bansemer informed the county attorney about Shari's involvement in a statement made on June 27, 1994, Bansemer was offered a plea bargain that allowed him to plead to second-degree murder in exchange for his testimony against any coconspirators or other participants, rather than face first-degree murder charges with the possibility of a hard 40 sentence. Conditions of the plea bargain required Bansemer's story to be truthful and consistent. The county attorney assured Bansemer that the plea bargain would not be changed even if his truthful testimony differed from his earlier accusations against Shari.

At trial, Bansemer provided a detailed description of how Shari had become his lover, promised to marry him, helped devise elaborate plans, and encouraged and persuaded him to kill Scott. He further testified that after he killed Scott, Shari turned cold, rejected him, and cut off their once-passionate relationship.

At trial, Bansemer testified he first met Shari at a pet shop she operated with her husband. He knew of their pending divorce and that they were closing their business. He agreed to give Shari a free chicken dinner at the place he worked in exchange for the name of a bird breeder. On January 13, 1994, they had that dinner with Shari's two children and discussed her problems with her husband and the divorce. Their relationship developed quickly. Bansemer helped Shari move to her mother and stepfather's farm on January 22, and they became sexually involved at about that time.

On January 30 they told Shari's parents of their plans to marry and Bansemer moved his camping trailer into a barn on the farm.

Bansemer testified that Shari told him the February 2, 1994, custody hearing had not gone as planned and she was upset. On February 4, Bansemer, Shari, and her stepfather discussed the hearing. Shari suggested, "Well, why don't we just kill him," and asked, "Well, if we could get him between Hugoton and Ulysses, how would we go about it?"

The next day Scott came and picked up their child. That evening, Shari inquired again about killing Scott. Bansemer and Shari then discussed possible scenarios, with Shari suggesting shooting Scott.

On the following Friday, Shari raised the subject again. She and Bansemer discussed how to disable Scott's car in a remote place so they could give him a ride, kill him, put his body in a river, and cover it with lime to cause decomposition. They rejected this particular plan as impractical. Bansemer attributed Shari's renewed interest in the crime to the stress of the ongoing custody battle but felt her interest was genuine. Shari had told him, "I want to kill him," and "I want Scott killed."

On the evening of February 16, Shari brought up another plan. She suggested killing Scott in front of the home of one of his friends so that the crime would look drug-related. She drew Bansemer a map showing how it could be accomplished. Bansemer rejected the plan as not feasible.

The following Tuesday evening, Shari brought up murdering Scott again. Shari and Bansemer discussed killing him at work, but again decided it was impractical. That Friday she asked about car bombs, but Bansemer felt the risk of injuring others was too high. In the ensuing days, Shari talked about other places to kill Scott, including at a halfway house, in his house (to which Shari drew Bansemer a map and floorplan), and outside a divorce seminar. They also discussed killing him with a guitar string. Shari and Bansemer practiced having Bansemer imitate the voice of a local pastor so he could trick Scott into opening the door of his house.

After a divorce seminar on March 10, Shari came home upset and explained that the custody battle was going to escalate and that Diseker was going to get involved. The next day Shari said, "Scott's

going to get all three husbands into this custody battle. And the second husband'll probably lie about me. And it'll just make it that much easier for Jeff to go for custody of the first one. I want to kill Scott Webber."

On March 14, Shari suggested killing Scott when he came to pick up their son for visitation the coming weekend and making it look like self-defense. On March 17, she again suggested killing Scott in his home. Shari suggested the killing take place on prom night since the police would be busy. Shari talked about how Bansemer would go to Scott's house by bicycle, what he would wear, what weapon he would use, the layout of the trailer park, and imitating the pastor. Shari again drew maps and helped Bansemer practice the plan and develop an alibi.

The next day Shari suggested moving up the schedule one day to March 25 because she would be at a slumber party with her children and therefore have a better alibi. The planning continued for the next few days.

At the time Bansemer was living at the farm, he was preparing a foundation for a prefabricated house Shari's parents were helping her buy. Shari became worried about her growing legal fees and the risk she would lose this new house if she lost custody of her children. Bansemer testified Shari said, "You or me do it. I want it, I want to get him this weekend. You either show me how to do it, and I'll do it, or you do it. But he's not going to raise Dalyn." They also promised to protect each other in the subsequent investigation.

On March 25, Shari assured Bansemer that killing Scott was what she wanted. That evening he drove by Scott's house several times but did not feel he could kill him. The next day Shari again assured Bansemer she wanted Scott killed and would do it herself if he would not. At about 7 p.m. she told him, "You need to go."

Bansemer drove by Scott's house, but Scott was not home. At about 9 p.m. he called Shari, who told him, "We've got to get him tonight." Bansemer returned to Scott's house by bicycle and, after a brief affray, shot and killed Scott. When asked at trial what his intention was when he walked to the door Bansemer replied, "To kill Scott Webber." Bansemer left Scott's house after the shooting,

flattening the tires on Scott's car as he left because he was upset and thought it might draw attention away from Shari, who stood to inherit the car.

At trial, Bansemer admitted he had told different stories about the murder, but claimed he was testifying to the true nature of the events. On cross-examination, Shari's counsel pointed out where Bansemer's testimony since the plea bargain differed from the story he had told before and also where his preliminary hearing testimony differed from that offered at trial. Shari's counsel also pointed out that Bansemer had a chronic alcohol problem and had been drinking heavily from March 25 until his arrest.

The prosecution also introduced evidence that Shari fled Kansas following Bansemer's May 18 arrest. Six days after the arrest, Shari purchased a cellular phone, telling the sales clerk she was planning a trip to Arkansas to leave one of her children with a parent and then California to leave another child.

On May 26, Diseker picked up Chloe for visitation for the summer. Shari was not home when Diseker arrived. Chloe told Diseker that she had gone to bed with Dalyn in the same bed the night before, but awoke to find Dalyn and her mother gone. Donna Diseker, Jeff's wife, testified that she felt at the time that Shari was not planning see Chloe again because she had not left a detailed inventory list that had always been very important to her when the Disekers had physical custody of Chloe.

During the night of May 25, Shari took Dalyn and left Kansas. She went to Texas and checked into a motel, using the name of Kathy Jays. While there, she dyed her hair.

Shari proceeded to Louisiana, where she again checked into a motel under the name of Kathy Jays. There she paid for lodging for a month and took out a newspaper advertisement seeking a child-care job. She told people at the motel that she was from Dodge City, Kansas, and would be staying for one or two months and then returning to Kansas.

A man by the name of Arlen Terry responded to Shari's newspaper advertisement. Shari identified herself as Kathy Jays and told Terry her husband had died in an automobile accident before she left Kansas and she planned to return in August to begin a voca-

tional education program. Later she told Terry her real name and said she was using the assumed name on the advice of her lawyer.

Upon the advice of a friend, Terry got Shari's driver's license number so that he could find out if there were any problems in her background. When he called the sheriff's office in Hugoton he was told of her suspected involvement in Scott's murder and that the police would come to Louisiana to pick her up. When he confronted Shari with what he knew, she explained that she feared the sheriff was involved in Scott's death and was now harassing her.

Together, Shari and Terry travelled on to Florida. Once in Florida, Terry came to realize Shari had been lying to him, and he told her she would have to leave. Terry persuaded Shari to return to Kansas.

Following her return, Shari was arrested on June 29, 1994, after answering a subpoena to appear at Bansemer's preliminary hearing. At the time, she was sitting in a chair with her purse in her lap. The police subsequently inventoried the contents of the purse and discovered $4,113 in cash, which fueled speculation she was planning to leave Kansas again. Shari testified the money was from checks that had accumulated while she was out of state and which she had cashed at her parents' grocery store.

While in jail awaiting trial, Shari developed a relationship with another prisoner, Nathan Rawlins, through a ventilation duct. She told him she might do some time for conspiracy, but not for the murder charge because she had not done the murdering.

During Shari's incarceration, a female prisoner, Beverly Romero, was transferred to the jail to share her cell and report any incriminating statements Shari might make. Shari told her about the plans with Bansemer to kill Scott, particularly a plan involving a car bomb. Shari told her the plan to kill Scott came about because he was an obstacle to Bansemer and Shari's relationship and Scott was causing custody problems.

The State introduced the testimony of Jerry Diederich to counter Shari's contention that she had no involvement in Scott's death, unless Bansemer had taken some off-handed remark she had made about Scott out of context. Diederich testified that he did some work for Shari during the time she was involved in a

custody battle with Diseker over Chloe in 1991. Shari asked him if he knew anyone who would be willing to murder Diseker. At the time, Diederich was surprised by how serious Shari seemed to be about the question. The court immediately gave the jury a limiting instruction. Shari testified her conversation with Diederich had been a joke.

Shari testified in her own defense. Her explanation of her relationship with Bansemer differed markedly from his description, but also differed from what law enforcement officers testified she had earlier told them. She testified that after their chicken dinner at Bansemer's place of employment, they had a brief but torrid love affair during the month of February. She testified Bansemer volunteered to pour the foundation for her house and was permitted to eat dinner with her and her parents and move his camper into the barn as compensation. He finished the foundation on March 1 and moved back to town on March 14.

She testified that she had shared her frustrations about Scott with Bansemer and may have said something about hoping to see Scott's picture on the back of a milk carton and other similar off-hand comments. She acknowledged discussing marriage with Bansemer, but denied that they were ever engaged or that they had exchanged engagement rings, as Bansemer and Shari's stepfather had claimed.

Shari explained her apparent flight as a bird-watching vacation in Louisiana. She said she had planned to go to California, but changed her mind. She did not tell people she had changed her mind so she would not be followed. She explained she feared harassment by local law enforcement, thinking the sheriff was involved in Scott's murder. When interviewed by the KBI and ATF outside the presence of Stevens County law enforcement officers on April 21, 1994, Shari did not mention her concern that the sheriff was involved.

Shari testified that before leaving Kansas, she contacted her attorney and asked whether any court order prohibited her from leaving. Her attorney checked the court records and informed her she was not bound to remain in the state. While outside the state, Shari said she contacted her attorney and had him investigate

whether there was a warrant issued. When she discovered there was a material witness warrant issued, she returned to Kansas.

In rebuttal, the State introduced the testimony of Donna Diseker that during one point in Diseker and Shari's custody fight, Shari had bragged about her ability to lie credibly with regard to pending court proceedings. Donna testified, "She said that she could lie better than we could tell the truth, and that no one would believe us because she was Chloe's mother, and that no one would believe us because the lies she told about us were so convincing."

The jury convicted Shari of both the first-degree murder and the conspiracy charges. After a sentencing hearing, the jury unanimously recommended the hard 40. The court imposed that sentence. On the conspiracy charge, the court imposed a concurrent sentence of 73 months.

Shari appeals raising 16 issues, which we will consider and answer as presented.

*Did the trial court erroneously admit evidence of Shari's flight from Kansas?*

Shari contends it was improper to admit as evidence of flight that she left Kansas after Bansemer's arrest, travelled to Louisiana under an assumed name, disguised herself, and attempted to secure employment, even though she had told people she was going to California to visit a family member.

Before trial, the court heard arguments and denied Shari's motion in limine to exclude evidence relating to Shari's trip from Kansas to Florida.

The record shows no contemporaneous or continuing objection during trial to the introduction of this evidence. Ordinarily, the lack of such an objection would prevent appellate review. See *State v. Johnson*, 255 Kan. 252, Syl. ¶ 1, 874 P.2d 623 (1994); K.S.A. 60-404. However, as this is a hard 40 case, by legislative direction we must nevertheless consider the merits of this claim. See *State v. Collier*, 259 Kan. 346, 913 P.2d 597 (1996).

In Kansas, a seminal case on flight evidence is *State v. Walker*, 226 Kan. 20, 22, 595 P.2d 1098 (1979). Although we noted in *Walker* that such evidence must necessarily be considered with

caution because of its ambiguous probative value, we nevertheless adopted a liberal approach to its admission. We held: "Conduct, including flight, of an accused following the commission of an alleged crime may be circumstantially relevant to prove both the commission of the acts charged and the intent and purpose for which those acts were committed." 226 Kan. 20, Syl. ¶ 2.

Shari relies on *State v. Wood*, 188 Kan. 833, 839-40, 365 P.2d 1080 (1961), to argue that her conduct does not support an inference of guilt. It was held in *Wood* that no presumption of guilt could be inferred from moving from one county to another upon the direction of counsel. Although Shari had checked with her attorney before leaving Kansas, *Wood* is not persuasive.

Shari maintains that her travel and subterfuge can be explained by reasons other than her involvement in the murder of her husband. She alleges that she believed law enforcement was involved in the crime and presented a continuing threat to her own well-being. Thus, she argues, she was fleeing from law enforcement but not because she was guilty. Shari was free to put forth this defense, but such evidence, which might weaken the inference of guilt implicit in the flight, "does not render the evidence of flight inadmissible, but is merely to be considered by the jury in weighing the effect of such evidence." *Walker*, 226 Kan. at 24.

The trial court has discretion to exclude evidence when its probative value is outweighed by its prejudicial effect on the jury. *State v. Martin*, 237 Kan. 285, Syl. ¶ 1, 699 P.2d 486 (1985). The trial court did not abuse its discretion in admitting evidence of Shari's travels.

*Did the trial court erroneously admit evidence that a large sum of money was found in Shari's purse at her arrest?*

Shari contends the trial court erroneously permitted the State to introduce evidence that a large sum of money was found in her purse at her arrest. From this evidence, the State surmised in its closing argument that Shari might have been planning to flee again following Bansemer's preliminary hearing.

In reviewing a trial court decision regarding the suppression of evidence, we review the factual underpinnings of the decision by

a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment. See *State v. Vandiver*, 257 Kan. 53, Syl. ¶ 6, 891 P.2d 350 (1995); *State v. Chiles*, 226 Kan. 140, 144, 595 P.2d 1130 (1979).

The evidence at issue was money discovered in her purse at the time of her arrest at the courthouse. She placed the purse on a chair as she stood to be handcuffed. In this circumstance, the State clearly had authority to inventory the contents of the purse to preserve the property of the accused and protect itself from a later claim that some property was missing. We explained the scope of such an inventory search in *State v. William*, 248 Kan. 389, Syl. ¶ 21, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991):

> "When an accused has been lawfully arrested and is being held in custody, the personal effects in his or her possession at the time and place of arrest may lawfully be searched, inventoried, and placed in safekeeping by law enforcement officers without a search warrant when the search and seizure is incidental to the arrest."

Shari's reliance on cases following *State v. Boster*, 217 Kan. 618, 630-31, 539 P.2d 294 (1975), for the principle that an inventory search is limited to items within plain view is misplaced as *Boster* and these other cases were explicitly overruled in *State v. Fortune*, 236 Kan. 248, 258, 689 P.2d 1196 (1984). See also *William*, 248 Kan. at 425-26 (rejecting plain view test for inventory of personal belongings possessed at time of arrest).

*Did the trial court erroneously exclude evidence that Shari took a polygraph test before leaving Kansas?*

Shari contends the trial court erroneously excluded evidence that she voluntarily took a polygraph test prior to leaving the state. She acknowledges the ironclad rule that the results of such examinations are inadmissible absent a stipulation between the parties, see *State v. Green*, 245 Kan. 398, Syl. ¶ 4, 781 P.2d 678 (1989), but argues the fact she willingly took the examination, without regard to the results, shows her innocent state of mind at the time she left Kansas and rebuts the inference of guilt that flight permitted.

The State argues that we have excluded not only the results of polygraph tests, but also testimony about a defendant's willingness to take one. See *State v. McCarty*, 224 Kan. 179, Syl. ¶ 2, 578 P.2d 274 (1978). It is the State's contention that admitting Shari's evidence would unavoidably imply the result and also imply that the polygraph was viewed by law enforcement to be a reliable and competent tool for discerning truthfulness.

"Polygraph tests are too unreliable to be admissible and they tend to invade the province of the jury in determining the ultimate question of fact: whether a witness is speaking the truth." *State v. Martin*, 237 Kan. 285, Syl. ¶ 3, 699 P.2d 486 (1985). "One of the factors in disallowing polygraph evidence is the weight placed upon the evidence by the jury, which results in the jury function being usurped." 237 Kan. 285, Syl. ¶ 7. It is well established that the results of a polygraph examination may not be used by a defendant to show the lack of guilty knowledge. See *State v. Mason*, 238 Kan. 129, 131, 708 P.2d 963 (1985). Similarly, absent a stipulation neither the refusal to submit to such an examination nor the offer to do so is admissible. *State v. McCarty*, 224 Kan. 179, 182; *State v. Roach*, 223 Kan. 732, Syl. ¶ 1, 576 P.2d 1082 (1978). More importantly in this case, it is improper to permit the defendant to refer to the taking of a polygraph test. See *State v. Wise*, 237 Kan. 117, 123-24, 697 P.2d 1295 (1985). Shari's argument that the fact an examination was taken can be admitted has no basis.

Although the record is unclear as to the details, it also appears that the examination Shari wanted in evidence was a private one she procured and not one requested by the State. The trial court did not err in excluding this evidence.

*Did the trial court erroneously admit evidence of Shari's alleged attempt to find someone to kill an earlier husband and her own self-reported ability to lie credibly in court?*

We next consider Shari's complaint that the trial court erroneously admitted the testimony of Diederich and Diseker. Diederich testified about a conversation he had with Shari during the time of an earlier divorce in which she inquired whether Diederich knew anyone she could hire to kill her husband. Diseker testified that in

the course of custody battles, Shari had bragged about her ability to lie, saying she could lie better than Diseker could tell the truth.

The admission or exclusion of evidence is within the trial court's sound discretion, subject to exclusionary rules. *State v. Schultz*, 252 Kan. 819, Syl. ¶ 9, 850 P.2d 818 (1993).

Shari argues that Diederich testimony is evidence of a prior bad act inadmissible under K.S.A. 60-447. In relevant part, that statute provides:

"Subject to K.S.A. 60-448 when a trait of a person's character is relevant as tending to prove conduct on a specified occasion, such trait may be proved in the same manner as provided by K.S.A. 60-446, except that (a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible . . . ."

In the present case, Diederich testimony was not admitted to prove any character trait of Webber. K.S.A. 60-447 is not the statute that controls its admissibility. K.S.A. 60-455 is. That statute provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

The State argues the testimony was admissible, and admitted, under K.S.A. 60-455. Prior to Diederich testimony, the trial court conducted a hearing outside the presence of the jury to determine whether the evidence was probative to any material issue in the case. The evidence was offered to show motive, intent, and absence of mistake, and the jury was informed of the limited purposes to which it could be put.

The trial court's decision to permit evidence of prior wrongs under K.S.A. 60-455 is subject to review for whether the trial court abused its discretion or whether it admitted clearly irrelevant evidence. *State v. Peckham*, 255 Kan. 310, 330, 875 P.2d 257 (1994). Considering the similarity of the incident to which Diederich testified and the current charges and the fact that Shari contended

Bansemer had misunderstood her intentions, the trial court cannot be said to have abused its discretion.

It is argued the testimony of Diseker was inadmissible because of K.S.A. 60-422(d). In relevant part, K.S.A. 60-422 provides:

"As affecting the credibility of a witness . . . (c) evidence of traits of his or her character other than honesty or veracity or their opposites shall be inadmissible; [and] (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

In *State v. Smallwood*, 223 Kan. 320, 326-27, 574 P.2d 1361 (1978), we explained the operation of subsections (c) and (d):

"In substance K.S.A. 60-422(c) disallows proof of general bad or good character and limits character evidence impeaching or supporting a witness's credibility to the traits of honesty or veracity or their opposites. K.S.A. 60-422(d), on the other hand, limits the manner of proving such character traits as affecting the credibility of a witness by disallowing evidence of specific instances of the witness's conduct. This limits K.S.A. 60-446, which allows proof of character by opinion testimony and evidence of reputation.

"Thus, a witness's credibility may be attacked by showing the witness has character traits for dishonesty or lack of veracity, but those traits may only be proven by opinion testimony or evidence of reputation. Those traits may not be proven by specific instances of the witness's past conduct."

Subsection (d) of K.S.A. 60-422, disallowing evidence of specific instances of conduct, does not apply to Diseker's testimony. Diseker's testimony did not relate to a specific act of dishonesty or conduct illustrative of a character trait. Compare *Smallwood*, 223 Kan. at 326.

Attacks on a witness' credibility to show dishonesty are permitted through the use of opinion or reputation evidence. *Herbstreith v. de Bakker*, 249 Kan. 67, 76, 815 P.2d 102 (1991). Diseker's testimony was simply a means of introducing Shari's own opinion of her own veracity and was not erroneous. A witness' self-assessment of his or her veracity is admissible to attack the witness' credibility in rebuttal. The trial court did not abuse its discretion. See *State v. Borthwick*, 255 Kan. 899, Syl. ¶ 11, 880 P.2d 1261 (1994) (admission of rebuttal evidence left to trial court discretion).

*Did the trial court err in limiting the cross-examination of Bansemer?*

Next, Shari argues the trial court erroneously prohibited the defense from cross-examining Bansemer about allegedly preferential treatment he received while in jail. During his cross-examination, Bansemer denied that, other than his deal to testify, he received from law enforcement officers any special treatment different from any other prisoners.

Counsel for Shari had approached the bench immediately before this questioning. At a later conference during a break in the cross-examination, counsel made a proffer of evidence he sought to introduce on the issue of preferential treatment while cross-examining Bansemer. Counsel proffered evidence that Bansemer had been allowed to go home for Thanksgiving dinner and that his family was permitted to have a Christmas party with him at the sheriff's office. The trial court ruled that those details were not relevant and that Shari had been permitted to ask if any special treatment had induced Bansemer to testify, which Bansemer denied. In response, Shari's counsel argued Bansemer might not have known he was receiving preferential treatment.

Limitations on the extent of cross-examination will not be overturned absent proof of a clear abuse of judicial discretion. See *State v. Brown*, 235 Kan. 688, Syl. ¶ 1, 681 P.2d 1071 (1984). Shari was allowed to inquire whether Bansemer felt he had received preferential treatment. From the context of the court's ruling, it is clear that she was not denied the opportunity to present evidence in her own case in chief rebutting Bansemer's denial; she was simply limited in the details she could discuss in cross-examination. Discretion is abused only when no reasonable person would agree with the trial court. The court did not abuse its discretion.

*Did the trial court err in instructing the jury on second-degree murder?*

Shari next argues that the trial court erroneously instructed the jury on second-degree murder. She contends one cannot aid, abet, or counsel another to commit murder without premeditation.

Second-degree murder requires the killing of a human being committed intentionally. K.S.A. 21-3402. It does not require that the killing be done without premeditation. A defendant can be

convicted of second-degree murder upon proof of facts which would establish first-degree murder. *State v. Carpenter*, 228 Kan. 115, 121, 612 P.2d 163 (1980).

Additionally, it appears this is a complaint about actions of the trial court which have wrought no harm. See *State v. Johnson*, 255 Kan. 140, 148, 871 P.2d 1246 (1994). Shari was convicted of first-degree murder. The instruction regarding second-degree murder made no difference.

*Did the trial court err in failing to give an instruction on criminal solicitation as a lesser included offense of either conspiracy to commit first-degree murder or aiding and abetting first-degree murder?*

Shari argues the jury was improperly instructed with regard to charges supported by the evidence introduced. First, she argues the trial court erred by failing to instruct the jury on the lesser included offense of criminal solicitation, K.S.A. 21-3303.

The court has a duty to instruct the jury of all lesser included offenses established by substantial evidence, however weak. *State v. Harmon*, 254 Kan. 87, Syl. ¶ 1, 865 P.2d 1011 (1993). A two-pronged test determines whether a lesser crime is a lesser included offense under K.S.A. 21-3107(2)(d):

"In determining whether a lesser crime is a lesser included offense under K.S.A. . . . . 21-3107(2)(d), a two-step analysis or two-pronged test has been adopted. The first step is to determine whether all of the statutory elements of the alleged lesser included crime are among the statutory elements required to prove the crime charged. If so, the lesser crime is a lesser included crime of the crime charged. Under the second prong of the test, even if the statutory elements of the lesser crime are not all included in the statutory elements of the crime charged, the lesser crime may still be a lesser included crime under K.S.A. . . . . 21-3107(2)(d) if the factual allegations of the charging document and the evidence required to be adduced at trial in order to prove the crime charged would also necessarily prove the lesser crime." *State v. Fike,* 243 Kan. 365, Syl. ¶ 1, 757 P.2d 724 (1988).

See *State v. Berberich*, 248 Kan. 854, 857, 811 P.2d 1192 (1991).

K.S.A. 21-3303(a) defines criminal solicitation:

"Criminal solicitation is commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the com-

mission or attempted commission of a felony for the purpose of promoting or facilitating the felony."

Shari does not argue that solicitation is a lesser included offense of conspiracy to commit first-degree murder and first-degree murder under the first prong of the *Fike* test. Instead, she argues the evidence required to prove the conspiracy and the first-degree murder charges necessarily would prove criminal solicitation in this case and would render criminal solicitation a lesser included offense under the second prong of the test.

The second prong of the *Fike* test requires both that the charging instrument allege facts which would prove the alleged lesser included offense and that the evidence required to prove the charge establish that such offense was committed. 243 Kan. at 368. The conspiracy charge alleged that Shari had "agree[d] with another person, namely Victor Lee Bansemer, Jr., to commit or assist in the commission of murder in the first degree, an overt act in furtherance thereof having been committed by said Victor Lee Bansemer, Jr." Because it would be possible to prove this charge without regard to whether Shari commanded, encouraged, or requested that Bansemer commit first-degree murder—an agreement, however reached, whether at Bansemer's prompting or Shari's, was enough—from the language of the complaint, solicitation would not be a lesser included offense of conspiracy.

We have recently held that solicitation to commit first-degree murder is a separate and independent criminal offense from aiding and abetting first-degree murder, and the jury need not be instructed on criminal solicitation as a lesser included offense. In *State v. DePriest*, 258 Kan. 596, 604-05, 907 P.2d 868 (1995), we said:

"We need not engage in a *Fike* analysis under the facts of this case because solicitation to commit first-degree murder is an independent criminal offense, separate and distinct from aiding and abetting first-degree murder. K.S.A. 1994 Supp. 21-3303(a) defines criminal solicitation as 'commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the commission or attempted commission of a felony for the purpose of promoting or facilitating the felony.' Solicitation is a specific intent crime under Kansas law. A person is not guilty of solicitation unless he or she intentionally commits the actus reus of the offense, viz., he or she commands, encourages, or

requests another person to commit a felony with the specific intent that the other commit the crime he or she solicited. The actus reus of the solicitation occurs under Kansas law if a person by words or actions invites, requests, commands, or encourages a second person to commit a crime. The crime is complete when the person communicates the solicitation to another with the requisite mens rea. No act in furtherance of the target needs to be performed by either person.

"K.S.A. 1994 Supp. 21-3205(1), on the other hand, states that '[a] person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime.' Thus if a person solicits another to murder the victim, as happened in this case, and the person solicited murders the victim, the defendant is an accomplice in the commission of the murder and may be convicted of that offense. In these circumstances, the crime of solicitation is a separate offense, not a lesser included offense of aiding and abetting first-degree murder. See *State v. Edwards*, 250 Kan. 320, 330-331, 826 P.2d 1355 (1992) (holding that criminal solicitation is a separate and distinct offense from aiding and abetting the crime of making a false writing).

"The evidence in this case was that the defendant solicited Moore to murder Hill. The evidence also established that Moore killed Hill. The question for resolution by the jury was whether the defendant aided and abetted in the commission of the murder. The jury found that he did. Once this was established the defendant was guilty of murder.

"The defendant was either guilty of murder as an aider and abettor or he was not guilty. The defendant was not charged with the separate offense of solicitation. The jury found that the evidence established beyond a reasonable doubt that the defendant encouraged or requested Moore to commit murder and, thereby, was guilty of the murder as an aider and abettor of the murder."

We hold this issue is resolved by our specific language in *De-Priest*.

*Are conspiracy to commit first-degree murder and aiding and abetting first-degree murder multiplicitous?*

The next challenge Shari levels against the crimes charged is that conspiracy to commit first-degree murder and aiding and abetting first-degree murder are multiplicitous. K.S.A. 21-3107 provides:

"(1) When the same conduct of a defendant may establish the commission of more than one crime under the laws of this state, the defendant may be prosecuted for each of such crimes. Each of such crimes may be alleged as a separate count in a single complaint, information or indictment.

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

. . . .

"(d) a crime necessarily proved if the crime charged were proved."

The Fifth Amendment guaranty against double jeopardy provides constitutional protection against multiple prosecutions for the same offense and multiple punishments for the same crime. *North Carolina v. Pearce*, 395 U.S. 711, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969). "Multiplicity exists if the State uses a single wrongful act as the basis for multiple charges. Charges are not multiplicitous if each charge requires proof of a fact not required in proving the other." *State v. Baker*, 255 Kan. 680, Syl. ¶ 2, 877 P.2d 946 (1994).

We have held that conspiracy and aiding and abetting another offense are not multiplicitous. *State v. Hobson*, 234 Kan. 133, 139, 671 P.2d 1365 (1983). Each offense requires proof of a element not required by the other: "Conspiracy requires an agreement to commit a crime, while aiding and abetting requires actual participation in the act constituting the offense."

Shari argues *Hobson* is distinguishable because in her case the jury must have relied on the same conduct to find both an implicit agreement and her actual participation. *Hobson* directly addresses this argument: "In the trial of a criminal case [multiplicity] does not depend upon whether the facts proved at trial are actually used to support conviction of both offenses charged; rather, it turns upon whether the necessary elements of proof of the one crime are included in the other." 234 Kan. 133, Syl. ¶ 3.

Conspiracy requires an overt act, while aiding and abetting does not. The evidence showing that Shari drew Bansemer maps and suggested methods of killing her husband, and that Bansemer then slew Scott, establishes the elements of aiding and abetting, but does not necessarily establish an agreement to commit the crime such that a conspiracy is proved.

*Do alleged deficiencies in the bill of particulars prepared by the State provide grounds for reversal?*

In October 1994, Shari moved for a bill of particulars pursuant to K.S.A. 22-3201. The motion sought a statement from the county attorney of "[t]he precise manner in which the crime of conspiracy is alleged to have been committed by the Defendant"; "[t]he pre-

cise overt act alleged as having been committed by Victor Lee Bansemer, Jr., in furtherance of the said conspiracy"; and "[t]he exact time and place wherein the said overt act occurred." In the second count, first-degree murder through a theory of aiding and abetting, the motion sought "[t]he precise manner in which the Defendant is alleged to have committed the crime charged."

Although a bill of particulars was furnished, there is no record of any objection to the bill of particulars prior to this appeal. For the first time on appeal, Shari asserts that she was denied her rights under the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.

K.S.A. 22-3201(f) establishes the procedure required to seek a bill of particulars:

"When a complaint, information, or indictment charges a crime but fails to specify the particulars of the crime sufficiently to enable the defendant to prepare a defense the court may, on written motion of the defendant, require the prosecuting attorney to file a bill of particulars. At trial the state's evidence shall be confined to the particulars of the bill."

Shari does not challenge the sufficiency of the complaint, but only the detail of the bill of particulars. The decision to require the prosecution to file a bill of particulars is discretionary with the trial court except in such cases where the charging instrument itself is insufficient to inform the accused of the charge against which he or she must defend. See *State v. Ashton*, 175 Kan. 164, 174-75, 262 P.2d 123 (1953). When a defendant challenges the sufficiency of a bill of particulars, the trial court does not abuse its discretion in denying a request for a more definite statement where the information disclosed in the bill of particulars, together with information revealed in the preliminary hearing and pretrial discovery, provides the defendant with "adequate knowledge of the nature of the charges and the opportunity to avoid surprise." *State v. Craven*, 215 Kan. 546, 549-50, 527 P.2d 1003 (1974); see also *State v. Kee*, 238 Kan. 342, 354, 711 P.2d 746 (1985) (no abuse of discretion in denying bill of particulars where record clear defendant was not misled).

The State's failure to timely and meaningfully comply with an order for a bill of particulars should be met with either a timely

objection or a request for a continuance by the offended party and consideration by the trial court of whether sanctions are merited, not a request for a new trial on appeal. See *State v. Coburn*, 220 Kan. 743, 745, 556 P.2d 376 (1976). By failing to avail herself of the opportunity to request a continuance or objecting to the detail provided by the State and by proceeding to trial, Shari waived any right she may have had to require a more definite bill of particulars. See *State v. Cory*, 211 Kan. 528, 533, 506 P.2d 1115 (1973); *State v. White*, 1 Kan. App. 2d 452, 457, 571 P.2d 6 (1977).

In the present case, the complaint, together with the bill of particulars, informed Shari of the charges which she was required to defend. The preliminary hearing and pretrial discovery disclosed in detail the factual allegations on which the charges were based. The trial court did not err in failing *sua sponte* to require the State to file a more definite bill of particulars. This allegation of error is without merit.

*Do the prosecutor's allegedly improper remarks during closing argument constitute reversible error?*

Next, Shari complains of the prosecutor's allegedly improper remarks in closing argument. Shari alleges the prosecutor referred to her exercise of her constitutional privilege against self-incrimination. She objected and the objection was sustained:

"Shari Webber needed Victor Bansemer so her hands would appear clean when the deed was done. Shari Webber lied, and lied, and lied from the beginning of this investigation. Why, ladies and gentlemen, is this the first time she has told the story she told during this trial? Because it is a lie. Why did she not tell the police—

"MR. MILLER: Your honor, I'm going to object, he is commenting on the defendant's right to remain silent.

"COURT: Sustained.

"MR. CONCANNON: Yes, your honor. She lied. Why didn't she admit the relationship—

"MR. MILLER: Same objection.

"MR. CONCANNON: —the relationship to Victor Bansemer?

"COURT: Overruled, it's a comment on the evidence . . . ."

Where the trial court sustains an objection there remains no grounds for assertion of error on appeal unless the remarks are so

prejudicial as to be incurable. *State v. Pursley*, 238 Kan. 253, Syl. ¶ 6, 710 P.2d 1231 (1985). See *State v. Herschberger*, 160 Kan. 514, 517, 163 P.2d 407 (1945) (on appeal, jury will be presumed to have disregarded evidence about which an objection was sustained); see also *State v. Pioletti*, 246 Kan. 49, 67, 785 P.2d 963 (1990) (no reversible error when objection to prosecutor's comment sustained).

The prosecutor's remarks were not an impermissible comment on Shari's post-arrest silence, notably because rather than invoking her right to silence, she chose to freely discuss her involvement in the crime with law enforcement officers. Because the prosecutor was interrupted, it is not clear whether the comment dealt with some issue she was merely silent about, or whether it dealt with some issue with regard to which the evidence indicated she actively misrepresented the facts to law enforcement officers during their investigation. The prosecutor's rewording of the question suggests that it was the latter. In any event, the remark was not so prejudicial as to be incurable, and there is no reversible error.

*Is Shari entitled to a new trial because the State failed to fully comply with a discovery order?*

Next, Shari contends the State intentionally violated a discovery order by failing to inform the defense that immediately prior to trial, Bansemer was assured that even if he changed his testimony, which had originally implicated Shari, his plea bargain would remain in place. Shari contends this was so prejudicial to her defense that a new trial is required.

"A trial court is vested with wide discretion in dealing with the failure of a party to comply with a discovery and inspection order. In exercising its discretion as to whether sanctions should be applied for violation of a discovery and inspection order the trial court should take into account the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances. In furtherance of just and expeditious determination of cases requests for continuance should be utilized where necessary if the party is surprised because of his adversary's failure to disclose in compliance with a discovery order." *State v. Coburn*, 220 Kan. 743, Syl. ¶ 1.

Initially, when made aware of the new arrangement with Bansemer, Shari's counsel requested a mistrial. The trial court suggested that the request might be granted when it stated: "[B]e very careful for what you ask, because you may receive it." Counsel was granted a requested recess until the following morning. After conferring with his client, defense counsel withdrew the mistrial request and did not ask for a further continuance. We have previously held that where the defendant specifically declines to request a mistrial based on an alleged error, the defendant cannot argue on appeal that the error requires a new trial. *State v. Johnson*, 219 Kan. 847, 850-51, 549 P.2d 1370 (1976).

Thus, even if the assurance that a plea bargain which has already resulted in a conviction and a sentence will not be revoked constitutes the type of evidence the prosecution should have revealed earlier under the discovery order, there is no reversible error.

*Did cumulative trial error deprive Shari of a fair trial?*

Shari argues that considered cumulatively, trial error denied her a fair trial. Considering the totality of the circumstances, she was not so substantially prejudiced by the alleged errors that she was denied a fair trial, which would require reversal of her conviction. See *State v. Castoreno*, 255 Kan. 401, Syl. ¶ 3, 874 P.2d 1173 (1994). There was wide divergence in the testimony of Bansemer and Shari, as well as conflicting evidence from other witnesses, from which the jury, acting as it should, determined the credibility of the witnesses and properly performed its legal and constitutional function.

*Was there sufficient evidence to support Shari's convictions of conspiracy to commit first-degree murder and first-degree murder?*

The final trial issue raised is the sufficiency of the evidence to support the convictions of conspiracy and first-degree murder.

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994).

Conspiracy requires proof of two essentials: an agreement between two or more people to commit or assist in committing a crime and an overt act furthering the object of the conspiracy by at least one of the conspirators. K.S.A. 21-3302; *State v. Hill*, 252 Kan. 637, Syl. ¶ 1, 847 P.2d 1267 (1993). Shari challenges the sufficiency of the evidence to show that she agreed with Bansemer to commit first-degree murder. She acknowledges Bansemer's detailed testimony regarding the extent of her involvement in encouraging him and helping him to plan the murder, but argues there was never any direct evidence of any agreement.

"To establish a conspiracy it is not necessary that there be any formal agreement manifested by formal words, written or spoken; it is enough if the parties tacitly come to an understanding in regard to the unlawful purpose, and this may be inferred from sufficiently significant circumstances."

"While an agreement is a necessary element of a conspiracy, the existence of an agreement need not be proved directly, but may be inferred from other facts proved. If one concurs in a conspiracy, no proof of an agreement to concur is necessary to establish guilt." *State v. Schultz*, 252 Kan. 819, Syl. ¶¶ 10, 11, 850 P.2d 818 (1993).

All the evidence in this case, viewed most favorably to the prosecution, is sufficient to support a conclusion beyond a reasonable doubt that Shari came to an agreement with Bansemer regarding the murder of Scott.

Shari also contests the sufficiency of the evidence to support her first-degree murder conviction. She argues that the ambiguity of the evidence regarding premeditation would prevent a rational jury from finding that the murder was premeditated. Shari recounts that Bansemer did not initially implicate her and had testified or told other people he was angry at the victim and "mad at the whole situation," and killed the victim during an altercation. Bansemer also testified he went to the victim's house to kill him, that he and Shari had been planning the killing for several weeks, and that Shari had sent him that night and the night before with instructions to kill Scott. There was ample evidence of premeditation.

Finally, Shari raises three issues regarding the sentencing phase of her trial.

*Is the aggravating circumstance on which the jury relied that the "defendant authorized or employed another person to commit the crime," K.S.A. 21-4625(4), unconstitutionally vague?*

Shari suggests an aggravating circumstance is impermissibly vague if it fails to give fair warning to those potentially subject to it and inadequately guards against arbitrary or discriminatory action. She also argues that as a criminal statute, it is to be strictly construed. When considering penalty provisions, we have explicitly rejected the rigorous approach to vagueness applied to statutes defining violations of the law. See *State v. Bailey*, 251 Kan. 156, 172-73, 834 P.2d 342 (1992). Because criminal conduct is a prerequisite to the application of sentencing statutes, the risk of infringing on constitutionally protected conduct is not involved; in addition, discretion is inherent in the sentencing process.

"[A] statute will not be declared void for vagueness and uncertainty where it employs words commonly used, previously judicially defined or having settled meaning in law." *State v. Rose,* 234 Kan. 1044, 1046, 677 P.2d 1011 (1984). K.S.A. 21-4625(4) employs commonly used words, easily understood by a jury applying them. It is not unconstitutionally vague.

*Was there sufficient evidence to support a finding beyond a reasonable doubt that one or more of the aggravating circumstances in K.S.A. 21-4625 outweighed any mitigating circumstances?*

Appellate review of a hard 40 sentence is sanctioned by K.S.A. 1993 Supp. 21-4627(3), which requires this court to determine "whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the findings that the aggravated circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances." *State v. Gideon*, 257 Kan. 591, Syl. ¶ 16, 894 P.2d 850 (1995). In fulfilling this mandate, we have adopted the following standard of review:

"When the sufficiency of the evidence establishing an aggravating circumstance in a hard 40 sentence is challenged, the standard of review is whether, after a review of all the evidence on this issue, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating

circumstance beyond a reasonable doubt." *State v. Reed*, 256 Kan. 547, Syl. ¶ 6, 886 P.2d 854 (1994).

The aggravating factor found in this case was that "[t]he defendant authorized or employed another person to commit the crime." K.S.A. 21-4625(4). Shari argued that mitigating circumstances should include her lack of prior criminal activity, the allegedly minor extent of her participation in a crime committed by another, and her age at the time of the crime.

Evidence presented at trial was clearly sufficient to establish that Shari cultivated a relationship with Bansemer to use him as an instrument to kill her husband. The aggravating factor was sufficiently supported, and a rational jury could find it outweighed any countervailing mitigating circumstances. There is no evidence the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

*Did the trial court err in denying Shari's proposed jury instructions during the sentencing phase?*

Finally, Shari argues that the trial court erred in failing to instruct the jury during the sentencing stage about the procedures and law governing the grant or denial of parole, and by failing to provide a definition of the term "mitigating."

Shari proposed a jury instruction based on K.S.A. 22-3717 which would have explained in detail the procedures for parole hearings and the factors considered by the parole board. The trial court refused to give this proposed instruction.

Shari argues that because the only difference between a hard 40 sentence and the sentence she otherwise would receive is when she would be eligible for parole, the jury should be made aware of the nature of the parole process.

Jury instructions which properly and fairly state the law as applied to the facts of the case which could not reasonably have misled the jury provide no basis for reversal. See *State v. Johnson*, 255 Kan. 252, Syl. ¶ 4, 874 P.2d 623 (1994). The instructions given, without reference to the nature of parole proceedings, correctly stated the law without creating the possibility of confusion with immaterial matters. The instructions given by the trial court were

not erroneous. It was not reversible error to refuse to give the requested instruction.

Shari also complains the trial court refused to provide a definition of "mitigating" when requested by the jury. During the sentencing deliberations the jury submitted the written question: "Could the jury have a simple lay definition of the term mitigating?"

Defense counsel requested the jury be instructed: "Mitigating circumstances are such as do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as reducing the degree of moral culpability." Instead, the trial court instructed the jury: "The terms in the jury's instructions are intended to be given their common definitions and usages. Please consider this instruction along with all other instructions previously given."

After receiving the trial court's instruction, the jury did not seek clarification but returned a unanimous verdict. The trial court did not abuse its discretion in the manner it answered the question.

Affirmed.